*114 On Motion to Dismiss Appeal.
MONROE, J.
[6] This is an action for the removal from office of the defendant district attorney, and the petition alleges that it is brought under articles 217, 221, and 222 of the Constitution, and Act 135 of 1880. There was judgment in the district court in favor of defendant, from which relator was granted an appeal. Defendant moves to dismiss the appeal, on the ground that the order of appeal was granted on August 31st, and the appeal was thereby made returnable within 10 days from that date, but, that it was not so returned; that on the eleventh day after the granting of said order relator obtained an extension of time, and subsequently a further extension, and finally returned the appeal to this court on October 3d; that his failure to file the transcript in this court within 10 days from the granting of said order was an abandonment of the appeal,; and that the extensions of time, obtained from this court, after the expiration of said delay, and under misapprehension on the part of the court, cannot avail him.
The facts are as stated in the motion. Whether they authorize the conclusion that the appeal was abandoned is the question to be determined.
Article 217 of the Constitution specifies the causes for which the Governor and certain other officers may be impeached. Article 221 provides that, for any of the causes so specified, certain -judges may be removed from office by judgments of the Supreme Court, in suits brought in that tribunal. Article 222, in so far as it need be quoted for the purposes of this ease, reads as follows:
“Art. 222: Eor any of the causes enumerated in article 217, members of the State Board of Appraisers, except the Auditor, Railroad Commissioners, district attorneys, clerks of court, sheriffs, coroners, justices of the peace, judges of the city courts and all other parish, municipal and ward officers, may be removed by judgment of the district court of the domicile of such officer. * * * The district attorney may, whenever, in his opinion, sufficient- cause exists therefor, and it shall be his duty (except when the suit is brought against himself) to, institute such suit, on the written request and information of twenty-five resident citizens and taxpayers. * * * Such suit shall be brought against a district attorney, upon such written request and information, by the district attorney of an adjoining district, or by counsel appointed by the judge for that purpose. In all suits instituted under this article, the defendant, the state, and the citizens and taxpayers, on whose information and at whose request such suit may have been brought, or any one of them, shall have the right to appeal, both on the law and the facts, from the judgment of the court. In eases against members of the State Board of Appraisers, Railroad Commissioners, district attorneys, clerks and sheriffs, the appeal shall be to the Supreme Court, and, in cases against all other officers, the appeal shall be to the Court of Appeal of the proper circuit.
“Such appeals shall be returnable within ten days to the appellate court, whenever it may be sitting or wherever it may hold its next session, and may be transferred, by order of the judges of said court, to another parish within their circuit, and such appeals shall be tried by preference over all other things. * * * ”
The law, upon the subject thus dealt with, which was on the statute books at the time of the adoption of the Constitution, was Act 135 of 1880, which was enacted to carry into effect certain articles of the Constitution of 1879, and, as no other statute on the same subject, of later date, seems to have been enacted, that, no doubt, is the statute applicable to this case. It is entitled:
“An act relative to suits-and the trial thereof before the district courts of the state, for the removal from office of district attorneys, clerks of courts, sheriffs, coroners, recorders, justices of the peace, and of all other parish, municipal, or ward officers under the provisions of articles 196 and 201 of the state Constitution; to provide for motions for new trials and for appeals from interlocutory decrees that might cause irreparable injury and from all final judgments in such suits.”
The text of the act answers to the title and follows the articles of the Constitution to which it refers, and one of those articles (201) is the prototype of the article 222 of the present Constitution, above quoted. The provisions of the act are specific as to the suits to be instituted under its authority, as to the mode of trial, right to move for new *116 trials, to appeal, and as to the return of the appeals, etc. Section 9 reads:
“That judgments in all such cases shall become of force and be executory as in other cases, before the district courts of the state.”
There is no repealing clause. The fact that the framers of the Constitutions of 1879 and 1S98 and the Legislature enacted the constitutional and statutory law thus referred to sustains the view which has been expressed by this court — that the matter of the removal of a public officer is “universally recognized as arising in, and from, the exercise of the political powers of the state, lodged in its legislative and executive branches,” and that, “if the judiciary has jurisdiction, in any manner, shape or form, over such proceedings, it is only by virtue of direct, special, exceptional, grant.” State ex rel. Whitaker v. Adams, 46 La. Ann. 832, 15 South. 491. Eor it is clear that, if the lawmakers had considered that suits, such as are thus specially provided for, were already authorized and regulated by the Code of Practice, or other existing law, they would not have made the additional provision. It is equally clear that the provision, having been made for the especially declared purpose of authorizing and regulating suits for the removal of officers, all general laws which might be thought to bear upon that subject were, and are, superseded, save in so far as they are saved or continued in force by the later enactment; and, in the main, such laws, including the Code of Practice, were so superseded. The section of the act of 1880 which is above quoted, however, declares, in effect, that the law governing “other cases before the district courts of the state” shall remain in force for the determination of the conditions under which judgments rendered in cases such as this shall become executory, and that is the immediate question with which we are dealing. As to “other cases before the district courts of the state,” it has long been settled that, under articles 588, 589, 590, 883, and 8S4, of the Code of Practice construed together, an appellant has three days, after the return day fixed in the order of appeal, within which to file his transcript, or apply for an extension of time, and that the appellee is not entitled, until such delay shall have expired, either to execute or affirm the judgment appealed from or to dismiss the appeal; and Act 106 of 1908 makes no change, in that respect, save to make those days running, instead of judicial, days. Brooks v. Smith, 118 La. 758, 43 South. 399; Welch v. Smith, 118 La. 761, 43 South. 400; Carrol v. Magee, 118 La. 762, 43 South. 400. We note, here, that the law regulating appeals in criminal and contested election cases contains no provision to the effect that judgments in “such cases shall become of force and be executory as in other cases before the district courts of the state”; hence, in cases of that character, the question of the delay for the return of the appeals is governed by the special statutes applicable thereto.
We have duly considered section 9 of tlie Act of 1880, in its relation to article 222 of the Constitution, and are of opinion that it is competent legislation. It is true that the article is peremptory in requiring the appeals to be returned within 10 days, but it leaves the penalty for nonperformance to the Legislature, in which department there is also vested considerable power in the matter of determining when a judgment shall become executory. Beyond that the act of the Legislature here in question was passed, in 1880, to carry into effect an article of the Constitution of 1879, which was almost, if not altogether, identical in its terms with the article of the present Constitution that we are now considering; and, if the framers of the present Constitution had considered that section 9 of said act misinterpreted article 201 of the Constitution of 1879, it is not likely that they would have adopted another article couched in the same *118 language. Again, if the appellant in a ease like this should be held to an absolutely .rigid compliance with the requirement to return his appeal within 10 days, on penalty ¡of losing it, he could obtain no relief from this court or elsewhere by way of extension ■of time, and it might very well happen that it would be impossible, within 10 days, to prepare the transcript, in a hardly contested case, and a miscarriage of justice would result. The motion to dismiss the appeal is ■therefore overruled.
On the Merits.
This action is brought, in the name of the state, upon the written request of 40 resident, citizen taxpayers of the parish of Jefferson, and, on the relation of the district attorney of an “adjoining district,” to remove defendant, for alleged “malfeasance, nonfeasance, and corruption” in the office of district attorney of the Twenty-Eighth judicial district, composed of the parishes of Jefferson, St. Charles, and St John the Baptist. The petition is signed by the district attorney of the “adjoining district”; but it designates, by name, the counsel whom the citizen taxpayers desire to represent them, and there is in the record a letter from the district attorney by whom the petition is signed, authorizing the counsel so designated to represent him also, which the counsel has done. Ten of the citizens referred to appeared in the course of the trial and stated, under oath, that they had withdrawn their consent to the use of their names and were not prosecuting the suit, all ■of them testifying that they had signed the instrument presented to them under a misapprehension as to what was intended, and, some of them, that their signatures had been obtained by false representations; and, save in one instance, there was no attempt to rebut their testimony. As the allegation of “corruption” is specifically made, it may be as well, at this time, to quote the following, which appears in the handwriting of relator’s counsel, upon one of the, otherwise, typewritten, pages of the record, to wit:
“During the examination of a witness, in the record, when an attempt was made by defendant to establish his record for honesty and integrity, I objected, stating I desired the inquiry confined to the charges in the record, as I had made no attack on the honesty or integrity of the defendant. I am told this was omitted by the stenographer. This objection was acquiesced in.
“[Signed] James Wilkinson,
“Atty. for Relator.”
Reduced to a simpler form, aud changing, somewhat, the order in which they are set forth in the petition, the matters relied on in support of the charges, as made, are substantially as follows: That defendant has been guilty of extortion in office: (1) In demanding and receiving, as district attorney, a fixed salary of $1,200 a year from each of the parishes in his district. (2) In demanding and receiving from the police jury $562.-18, as 20 per cent, of the fines imposed and collected in criminal cases by the Twenty-Eighth judicial district court, sitting for the parish of Jefferson, for the years 1908, 1909, 1910. (3) In demanding and receiving from the police jury $500 for attending to a civil suit involving the validity of the charter of the town of Kenner, and in demanding and receiving in the “Kenner matter” a fee of $286.45. • (4) In approving the bill of Anthony Madere, sheriff of the parish of St. Charles, for $487.73, in the case of State v. Dent.
That defendant has been guilty of misfeasance, or nonfeasance, in office, or both: (5) In that, during his incumbency of said office, between December, 1907, and March 12, 1912, one Joseph Hyland conducted a notorious gambling house in Jefferson parish, and that defendant ignored, or failed to act on, repeated complaints which were made to him or came to his knowledge concerning the same. (6) That he “actively sought to screen and hide said gambling iniquity from judicial *120 scrutiny,” in that, in the matter of State v. Petit, called for trial in the district court in April, 1907, one Reach, summoned as a juror and sworn on his “voir dire,” testified that he was a deputy sheriff and that he was working in Joseph Hyland’s house, up there on the protection levee; that a bill of exception was taken to the competency of the juror, and his testimony was made part of the bill; that an appeal was taken in the case, and that defendant “sought and obtained the consent of the counsel for the accused to have stricken out * * * the question and answer that Reach was a deputy sheriff, for the reason that the said district attorney was unwilling for the Supreme Court to know the close relations between the officers of Jefferson parish and the gambling houses of that parish.” (7) That defendant’s father (who was sheriff of the parish) and his brother owned a building on the most prominent street in Gretna, one square from the courthouse, the second floor of which was rented to Joseph Boudreaux and Andrew Linden, who run, and for three years past have run, a keno game therein, openly and publicly, to the knowledge of defendant, who has taken no steps to prevent it. (8) That, on the east bank of the river, one Edward- O’Dwyer conducts a daily lottery, which is largely patronized; and that, in McDonoughville, on the west bank, in the house of Fanny Carmouche, a colored woman, a daily lottery has been regularly and notoriously carried on by Sidney J. Whiteside, a deputy sheriff, all to the knowledge of defendant. (9) That on January 23, 1909, the Times-Demoerat sent a reporter to investigate said McDonoughville lottery, that after securing a ticket therein, said reporter was violently assaulted by an adherent of said Whiteside, and that, though the matter was published next day, and came to the knowledge of defendant, he did nothing about it or about the lottery. (10) That, from 1904 to 1910, slot machines were operated for money in almost all the liquor saloons in Jefferson parish, and that such machines are now operated in Mouillut’s saloon, the saloon of F. Bracklein, also in A. G. Kerner’s saloon, and that defendant has done, and does, nothing about it, though the violation of the law has been and is known to him. (11) That defendant aided and abetted flagrant violations of the law in “advising and counseling” the formation of “Social Clubs,” so called, having approved the charter of the Jefferson Social Club, under which the said Boudreaux and Linden operate, and the charter of the County Social Club, under which the said Hyland operates, a gambling house. (12) That, though there is an ordinance of the police jury penalizing the business of fortune telling, defendant has knowingly permitted that business to be carried on and publicly advertised.
Defendant denies, generally, the averments of the petition; alleges that he is district attorney for the Twenty-Eighth judicial district, that he has been elected to that office for two terms, and that he has faithfully and honestly discharged the duties thereof.
Construing the general charges contained in the petition with the disclaimer, to which we have referred, and with the specifications, we are left in some doubt as to their intent and meaning; for, while the word “corruption” has not been specifically withdrawn, the disclaimer of any intention to attack defendant’s “honesty and integrity” would seem to carry with it the withdrawal or abandonment of that charge. According to one of the latest, as well as the oldest and most approved, of our authorities, the adjective “corrupt” and the nouns “corruption,” “honesty,” and “integrity” are interrelated as follows:
“Corrupt. * * * (3) Changed from a state of uprightness, correctness, truth, etc., to a worse state; vitiated, depraved, debased, perverted; as, corrupt language, corrupt judges; * * * An object is corrupt when it has lost *122 its original soundness, integrity, or purity, as corrupt flesh; corrupt judge. * * *
“Corruption. * * * C. Act of impairing integrity, virtue, or moral principle, or the state of being morally debased; loss of purity or integrity; depravity; impurity. Corruption of an officer, trustee, etc., is inducing him, _ by means of improper considerations, to commit a violation of duty. * * *
“Honesty. * * * (1) Quality or state of being honest; specif.: a. Honor; honorableness; suitableness; decency; also, generosity; liberality. Obs. b. Fairness and straightforwardness of conduct, speech, etc.; probity; integrity; sincerity; truthfulness; freedom from fraud or guile. * * *
“integrity. * * * Moral soundness; honesty ; freedom from corrupting influence or practice; esp., strictness in the fulfillment of business contracts; the discharge of agencies, trusts, and the like; uprightness; rectitude.” Webster New International Dictionary.
We shall now consider, in the order in which they have heretofore been stated, the specific grounds upon which relator’s charges of “malfeasance, nonfeasance, and corruption” (assuming that his disclaimer of any intention to attack defendant’s “honesty or integrity” has not altogether destroyed the significance of the word last mentioned) are based.
[1] 1. That defendant was guilty of extortion in office, in entering into contracts under which he received $1,200 a year from each of the parishes within his district, in lieu of fees allowed by law for convictions in criminal cases.
When defendant first went into office, he found such contracts, between the police juries and his predecessor, in existence, and they were then, and at the date of the trial, in existence in a large number of the other parishes. In fact, the belief was quite general that such contracts could lawfully be made, and it is stated that the Attorney General so advised as late as 1910. Counsel for relator, as district attorney of an adjoining district, worked, under such contract, until, as he says, his term of office expired, which was about the time that this court decided the case of State ex rel. Broussard v. Henderson, 120 La. 535, 45 South. 430, in which, counsel thinks, it was held that the contracts were illegal. The question decided in that ease, however, was that the relator (district attorney) had no right to recover 20 per cent, (after deducting the sheriff’s fees) .of the amounts collected from forfeited bonds and fines, and we should hesitate to say that the question of the validity of contracts such as those now under consideration was covered by that decision. At all events, that question was not decided, and, so far as we know, has never been decided, by this court. Under such circumstances, we do not think that defendant and the members of the police juries in his district and the district attorneys and the police jurors in other districts and parishes rendered themselves liable to removal from office for construing the law as they did, even if, hereafter, when the issue is presented, it should be held that their construction was erroneous.
[2] 2. That defendant was guilty of extortion, in demanding and receiving from the police jury $562.18, as 20 per cent, (after deducting the amount due the sheriff) of the amounts collected for fines and forfeitures in the Twenty-Eighth judicial district court, parish of Jefferson. The police jury had contracted to pay defendant a salary of $1,-200 a year, with the understanding that he was also to collect, from the sheriff, the 20 per cent, referred to. When this court decided that district attorneys had no right to collect the 20 per cent., but that it belonged to the school fund, defendant ceased to collect it, and thereafter he submitted to the police jury the question whether, in view of the fact that they had agreed to pay a certain salary, with’ the understanding that he was also to receive the 20 per cent., they ought not, when the 20 per cent, was thus cut off, to make good the deficit; and they concurred in that view. They therefore added that amount to his salary, and, as they were not liable to removal from office, for *124 fixing and paying his salary, originally, nor he, for receiving it, they are not so liable because the amount was increased, under the circumstances stated.
[3] 3. That defendant was guilty of extortion, in demanding and receiving, from the police jury, $500, and $286.45, as fees in the “Kenner matter.” Kenner is a small town in Jefferson parish which had a charter and which had on hand some $5,400 in cash, with debts to the amount of, say, $2,400. The Legislature repealed the charter, and thereupon some of the citizens enjoined the enforcement of the repealing act, on the ground that it was unconstitutional. Defendant and his late opponent in the race for the district attorneyship were employed by the police jury to defend the suit, which they did, successfully ; and they each presented a bill for $250, which was paid, there having been $36.45 added to defendant’s bill on account of expenses incurred in visiting the state capital in connection with the matter. The charge that defendant received $500 and $280.45 was based upon a misapprehension. The Act No. 125 of 1912 had not then been passed, and we know of no law which required the district attorneys to bring and defend civil suits for the police juries without compensation.
4. Extortion in office is also attributed to defendant on the ground that he approved a bill of the sheriff of St. Charles parish, amounting to $487.73, in the matter of State v. Dent, though he knew that it contained an overcharge of $200. The facts in that connection are that Dent (a negro) killed two other negroes whilst coming down the river, through the parish of St. Charles, and made his escape. A year later, the sheriff received a message from the chief of police of St. Louis, to the effect tnat he had Dent under arrest, and the sheriff, on the advice of defendant, went after him and brought him back; after which, the sheriff presented his bill. The president of the police jury thought that the crimes, having been committed on the river, were cognizable in the United States court, and that the bill ought not to be paid by the parish. Defendant was asked his opinion on that question, and gave it, in writing, to the effect that the offense was cognizable in the state court, saying, in the same communication, that he had not been asked his advice as to the items of the bill, but would be glad to give it if desired. The police jury, or its president, wrote to the' Attorney General on that subject and received a reply, from which it resulted that some of the items of the bill were to be disallowed ; and a motion was made and carried, by a vote of 3 to 2, that the bill be returned to the sheriff, in order that he might correct it. The president of the police jury was in the minority, and the question whether the bill should or should not be so returned was referred to defendant, who advised that the vote of the majority should control. He never approved the bill as alleged and had no further connection with it than as stated.
[4] 5. That during defendant’s incumbency of the office of district attorney, between December, 1907, and March 12, 1912, one Joseph Hyland conducted a notorious gambling house in Jefferson parish, and that defendant ignored, and failed to act on, repeated complaints which were made to him, or came to his knowledge, concerning the same.
There were about 50 witnesses examined on behalf of relator, and perhaps as many on behalf of defendant, and, save as will be hereafter stated, not one of them asserted that he had ever complained to defendant about Hyland’s establishment or had ever given him any information concerning it. To the contrary, whilst a number of them testified that they had participated in the gambling, and that they now desire to have de *126 fendant removed from office for permitting it, they also testified that they did not consider it any business of theirs to inform him that it was going on or to furnish him with the information which would have enabled him to suppress it.
In the early part of the campaign which preceded the general election in April, 1908, there was organized in the seventeenth ward of New Orleans a club, of which Mr. D. Hermann was president, or chairman, and concerning which, and the action of which, Mr. Hermann, as a witness for relator, testified, in substance, as follows: That he lives, and keeps a furniture store, about seven blocks from Hyland’s place, and has lived there nine years; that the purpose of the organization in question was the enforcement of the law; that, when they organized, they did not have the “gambling dives at Southport” in contemplation; but that, at the second or third meeting, one of the members offered a resolution on that subject, which was adopted; that he, himself, knew nothing about the gambling, “any further than getting it through the press and common talk of the town”; that he had heard of Hyland’s place being closed three times, the first time for a year and a half, the second time for .a shorter period, and the third time within a few weeks prior to the giving of his testimony; that he had heard men say that they had gambled at Hyland’s, but could not say that they would admit it to-day; that men frequently boasted of it; but that he was unable to recall the name of any one who had done so.
The resolution adopted by the club was forwarded to Gov. Blanchard, and on September 23, 1907, he wrote to defendant, informing him of its receipt and requesting him to take action to enforce the law prohibiting gambling; to find out who-the offenders were and cause their arrest and prosecution ; to bring the matter before the grand jury; and, if indictments were not returned, to file bills of information. Defendant testifies, as to the action taken, as follows:
“I took the matter up with the sheriff, and I then requested him, in connection with the police force, to make an investigation of the matter, with a view of either preferring charges or suppressing the evil, if it existed. * * * Well, I was informed that the police, by instructions, had made an investigation, and that they found no gambling and were unable to secure any evidence upon which a prosecution could be-based. In other words, if there had been any gambling prior thereto, at that time it was not in existence, and I was satisfied that Mr. Hyland was not operating a gambling house.”
In January, 1909, Gov. Sanders wrote to defendant that he had received numerous letters and complaints relative to gambling at Southport, to violations of the Sunday and game laws, and of the Gay-Shattuck law at the race track in Jefferson parish. There is no charge against defendant for nonenforcement of the Sunday law, the game law, or the Gay-Shattuck law at the race track, the facts in regard to the matter last mentioned being: That defendant, after personally visiting the race track, concluded that the law was not being violated there; that the Governor, at his request, directed the district attorney of Orleans parish to take the matter up, which he did; that this court decided that defendant could not be recused; and that the race track was abandoned. Concerning the information upon which he predicated his letter, the action taken, and his own knowledge of the conditions existing in the parish of Jefferson, the Governor, called as-a witness for relator, testifies, in part and in substance, as follows: That his only reason for writing the letters (there having been two-letters on the same day) was the information derived from the newspapers and from letters received by him; that one of the letters was from an organization in the sixteenth or seventeenth ward (referring, as we understand, to the organization of which Mr. Werner was chairman), and the other was from *128 a minister of the gospel, in addition to which, there were several anonymous communications; that, on or about the date upon which his letters were written, he had a conference with Judge Edrington, Sheriff Marrero, District Attorney Marrero, and District Attorney Adams (of Orleans parish), at which he laid before them the complaints about gambling at Southport; that all the Jefferson officials assured him that they would look into, and stop it, if it were going on; that he has no recollection of having heard any further complaint; that the parish of Jefferson, “under the Marrero administration, is a whole lot better” than it was, at the beginning of their administration, from the standpoint of law and peace; that he considered it part of his duty to keep informed as to the administration of Justice in the different parishes, and it was his impression that defendant’s record as district attorney was very good. Defendant testifies that, upon receipt of the communications from Gov. Sanders, he referred the matter to the sheriff, and reguested him to make an investigation, and that the sheriff reported that he could find no evidence of any gambling at Hyland’s and could not get any witnesses to testify to any.
On June 30, 1911, defendant received a letter from Mr. K. V. Richard, a respected member of the New Orleans bar, saying that he wrote, on behalf of clients interested in the enforcement of the anti-gambling law, to inform defendant that the law was being violated by Hyland, who was conducting a gambling house at Southport; that his clients had furnished him with much evidence to establish the fact, and he would be pleased to place the same in defendant’s possession. Defendant answered on July 3d, saying:
“If you will furnish me with the information in your possession, I assure you that I will see that immediate steps are taken to enforce the anti-gambling laws. I shall be glad to take the matter up, with you as soon as it is convenient for you to do so’.” - j
On July 15th, following, defendant and Mr. Richard met in one of the courts, and an appointment was made for that afternoon, when Mr. Richard was to appear at defendant’s office, with witnesses, whose statements were to be taken. Defendant had, however, at that time, arranged to leave the city on the following day, for his summer vacation, and, finding himself unable, in view of other engagements, to keep his appointment, he telephoned to Mr. Richard, who had appeared with four witnesses, to have their statéments reduced to writing, by his (defendant’s) stenographer, which was done, and the: statements were turned over by defendant to the sheriff, who caused an affidavit to be made, charging Hyland with permitting gambling on his premises, upon which affidavit Hyland was arrested and reguired to give bond for his appearance. Defendant returned to the city in September, prepared, as he states, to proceed with the prosecution of Hyland upon the more serious charge of conducting a banking game, but the Judge of the district court was taken sick, with typhoid fever, and the Judge who was called to act in his place, more especially in a particular matter, found himself unable to take up litigated cases, so that the October criminal term of the court was virtually pretermitted, and the next term came in April, at which time defendant filed an information charging Hyland with running a banking game and caused the case to be fixed for trial and subpoenas to be issued for the witnesses whose names had been given him. He was, however, unable to get them, as they lived in New Orleans and avoided service.
In the meanwhile, he had some correspondence with Mr. Richard, to wit: He caused a letter to be written to that gentleman informing him that the case was fixed for trial, reguesting him to Join in the prosecution, and saying that he had written to the witnesses to meet him at his office the next day *130 at 11 o’clock and would appreciate it if Mr. Rickard would be there and would furnish any further information that he might have. Mr. Richard replied, on April 13th, saying:
“As the wheels of justice move so slowly in Jefferson parish, my client has lost all interest in the matter and does not now care to expend any more money for the prosecution of Mr. Jos. Hyland.”
Defendant wrote again, informing Mr. Richard that the witnesses whose names had been furnished had failed to appear at his office and had failed to appear in court, on the day fixed for the trial, and urging Mr. Richard to change his attitude, or at least give him the benefit of the information which he possessed, but without result On the day upon which the case was last fixed, Mr. Richard appeared in court, in answer to a, subpoena, and stated that he preferred not to give the name of the client whom he was-representing, or, without the consent of the parties from whom he had received them, to furnish certain lists, which he said were in his possession, of the names of 100 persons who would be able to support the charge against Hyland. He also said that the witnesses whose statements had been taken had told him that they did not intend to appear in the prosecution, because they apprehended that they would be cross-examined in regard to their records and other matters that would be unpleasant to them; and so the case was continued, indefinitely, for lack of evidence. Counsel for relator says, in his brief:
_ “There were 22 different daily sessions of court since he returned and before the petition was filed to remove defendant. * * * Yet, though 17 informations were filed, for various crimes, during those 22 days, some of which were for felonies and nearly all of which were committed months later in 1911 than the Hyland offense, no information was filed against Hyland until April 1st; that being the third day after suit had been brought to remove defendant from office,” etc.
The statement thus made ignores the uncontroverted evidence to the effect that the criminal term of the court began in April; that it would have been unusual, and probably useless, to have asked the judge to take up the Hyland case to the prejudice of the congested civil docket; that the information in that ease was filed, with all other informations, on the first day of the criminal term; that nothing would have been gained by filing it before; and that the informations to which the counsel refers were filed in cases where the defendants expressed a desire to plead guilty and receive sentence — not one of them having necessitated a trial.
On one page of his brief, counsel for relator says:
“Defendant had exceptional opportunities to enforce the law; his father was sheriff; his brother was chief deputy sheriff; the parish teemed with other deputy sheriffs and police officers.”
On another page, after suggesting a contrast between the alleged inaction of defendant and the action of “those great district attorneys, Jerome and Folk,” who led in battering down doors to get at “gamblers violating the law,” he says:
“Your honors can imagine how fruitful of results investigations referred to deputies Green-leaf, Koerber, and 'Beach would have been or to Capt. Fisher, chief of the Jefferson police, or Officer Winfield, of that body, who, Dr. Gelbke testifies, were both with him when the calling of the keno from the sheriff’s tenant’s gambling room was heard by him on the street, one block away from the courthouse.”
[5] If, however, the sheriff and his deputies and the police were not to be relied on, and the average citizen considered it no business of his to furnish the district attorney with either aid or information, what “exceptional opportunities” had defendant to enforce the law, and whom was he to lead in battering down the doors? We appreciate the valuable work done by the distinguished officers mentioned, and there may be included in the same honorable mention the present prosecuting officer in New York City; but we have serious doubts whether gam *132 bling has been altogether suppressed in either New York or St. Louis, and we apprehend that those officers would not have accomplished as much as they did, unaided by a public sentiment and by voluntary contributions of money. Defendant is one of, perhaps, 1,000 other prosecuting officers, in this country, who may, in proportion to their means and opportunities, have discharged the duties of their offices as conscientiously as the two who have attained such prominence. The parish of Jefferson covers a large area, of land and water, extending from the confines of the city of New Orleans to the Gulf of Mexico, and it is inhabited by a most heterogeneous population, of planters, business men, and manufacturers, of high character, with some thousands of employes —mechanics and laborers — no doubt excellent citizens, lumbermen, fishermen, shrimp catchers, Malays, Chinese, Sicilians, n'egroes, etc., to which (the regular population) may be added, upon any day or night of the week, the waifs', estrays, crooks, and desperadoes, who, by reason of police activity in the city of New Orleans, are, from time to time, driven beyond the limits of the city and find temporary refuge in the vicinity of the protection levee where Hyland’s place is shown to have been situated. The parish was long known as the “Free State Jefferson,” and its citizens, who were born and reared there, have testified in this case that it was, at one time, a place where the law was but lightly regarded, and where murder and robbery and arson were of such common occurrence that neither life nor property were safe. They have further testified that, under the administration of the Marreros, there has been a vast change for the better. But neither in the parish of Jefferson, nor in any other place of which we have any definite knowledge, is it possible, at all times, to enforce all the law; and hence the moral conviction that the law has been, or is being, violated, in this or that respect, at a particular time, goes but a little way in making out a case for the removal from office of a particular officer, charged with its enforcement. Such conviction should be supplemented by evidence, showing that the officer possessed, or with reasonable effort might have obtained, the information and means required to secure convictions before a court and jury, and that he closed his eyes to his duty and neglected or misused his opportunities. That kind of assistance was not furnished to the defendant in this case, nor is it shown that he could have obtained it; Mr. Richard and a man named Bonaventura being, of all the witnesses who have testified, the only ones who could say that they ever furnished defendant with any information upon which he might have acted, and he acted upon that information so far as it was practicable for him to do so. Bonaventura, it may be remarked, was a waiter at a stand in the French market, and was one of the four witnesses whose statements Mr. Richard caused to be taken in defendant’s office. Relator seems to have been able to procure his presence on the trial of this ease, to testify against defendant; but defendant was unable to find him in order to get him to testify against Hyland, and he was one of those who told Mr. Richard that he did not intend to appear in that prosecution. The learned counsel for relator refers to section 1018 of the Revised Statutes, and says that it was the duty of defendant to find the facts for himself. That section provides that:
“Whenever the Attorney General or any district attorney shall be informed that a crime or misdemeanor has been committed, and that no complaint or declaration thereof has been made before any judge or justice of the peace, it shall be their duty, respectively, to inquire, ex officio, into the fact, by causing all persons they shall suppose to have some knowledge of the fact to be summoned before some judge or justice of the peace that their depositions may be taken.”
The law thus quoted does not require the officers mentioned to assume the functions *134 of detectives and undertake, personally, to ferret out the facts connected with offenses of which they may have heard or the names of the witnesses thereto; and, where they have no reason to suppose that any particular persons have knowledge of such offenses, tile amount of time and attention that they ought to devote to their investigation would depend, largely, upon their character, as compared with other offenses, affecting the community and requiring attention, the means at the command of the officers, and the probability of their accomplishing any practical results.
The only persons whom it is shown that defendant had any reason to suppose had personal knowledge of gambling at Hyland’s were the witnesses who were taken to his office by Mr. Richard, and who lived beyond the jurisdiction of the court in which Hyland must needs have been prosecuted, if prosecuted at all, and his experience in attempting to get them into that court, we have stated.
[7] 6. It is charged that defendant “actively sought to screen and hide said gambling iniquity from judicial scrutiny,” in that he sought and obtained the consent of counsel for defendant, in the matter of State v. Petit, to have stricken from a bill ‘of exception the testimony of one Reach, given on his voir dire, when called as a juror, to the effect that he was a deputy sheriff and was working in Hyland’s gambling house, “for the reason that the said district attorney was unwilling for the Supreme Court to know the close relations between the officials of Jefferson and the gambling houses of that parish.”
The circumstances under which the request is said to have been made were as follows: The case of State v. Petit was one in which the accused was charged with the capital offense of breaking and entering a dwelling house, in the nighttime, with intent to commit the crime of rape, and also for an assault, with intent to rape a certain woman there being in said dwelling house, and the court was engaged in impaneling a jury. Joseph Reach, sworn upon his voir dire, was asked whether he was not a deputy sheriff, to which he replied that he held a commission as deputy sheriff. He was then asked what his business was, and he replied that he was a stable boy for Mr. Joseph Hyland. 1-Ie was asked whether he was telling the truth in so stating, and he replied that he was handling Mr. Hyland’s horses. He was asked what salary he received and replied that he was working for Hyland. And the following, questions and answers were then propounded and given, to wit:
“You are engaged in conducting a game of chance up there, are you not? (Counsel for the state objects to said question.) A. Yes, sir. Q. And that is your business? A. Yes, sir.”
The bill of exception whereby the matter was presented to the trial court (and which came up in the transcript to this court) does not refer to the testimony of the witness, to the effect that he held a commission as deputy sheriff, and, on the other hand, purports to quote the last few questions and answers propounded to, and given by, him, as follows:
“Q. You are engaged in conducting a game of chance, for Mr. Hyland, up there at. the protection levee, are you not? A. Yes, sir. Q. Mr. Hyland is the proprietor of a gambling house? A. Yes, sir. Q. And that is your business? A. Yes, sir.”
Counsel for the accused, in the case mentioned (who, subsequently, became the opponent of defendant in the contest for the district attorneyship, and, though reluctantly, a witness in this case), testified that, 1 upon the request of defendant, and in view of the fact that the question of the competency of a person holding a commission as deputy sheriff to serve as a juror was otherwise reserved, he omitted from the bill all reference to Reach’s statement that he held *136 such a commission, and that, under the circumstances, he felt that he had the right to present the meaning of the witness, in testifying as to his business, by the use of more specific language, to which defendant made no objection. Defendant denies that he made the request attributed to him and denies that he knew of, or consented to, the incorporation in the- bill of any other language than that actually used by the proposed juror, stating that he did not particularly observe what the bill contained on that subject.
It is shown that the sheriff issues commissions as deputy sheriffs to a good many persons, in different parts of the parish; that such persons receive no pay and are so appointed to serve in cases where an officer may be needed, at once, and it would be impracticable to reach the sheriff or one of his active, paid deputies; and that the practice of making such appointments is a common one throughout the state.
It is not unlikely that some of the appointees, so selected, may prove unfit, but the occasion when the district court was impaneling a jury for the trial of a capital offense, such as that with which Petit was charged, was an inopportune one for the investigation of that question, in a particular case, and yet it would have been hardly fair to the sheriff to have it appear, without giving him an opportunity to deny or explain, upon the face of a record which was to come to this court and be reported in the jurisprudence, that he had appointed and maintained in position, as his deputy, a person engaged in violating the law as a 'business. A request such as that attributed to defendant would not, therefore, have been improper, if made, and there would have been no impropriety in the granting of it. The difference between the witnesses is based upon a difference in .their recollection of circumstances more than five years old, and we need not attempt to determine which was correct
The letter from Gov. Blanchard was received by_ defendant within about 10 days after the occurrence here in question, and we have already considered the fact and sufficiency of the action then taken by him in reference to the Hyland establishment.
7. Defendant’s father and brother owned the buildings upon a corner in Gretna, about a square away from the courthouse, which were rented to John Boudreaux, who conducted a saloon upon the lower floor. There is testimony to the effect that in 1911, and early in 1912, the game of keno was played, in some room or rooms, in the upper story of the building, perhaps twice a week, at night, and now and then on Sundays, in the daytime, and there are rather vague references to such a game, at some previous time when the place was occupied by a person By the name of Schneider. Defendant’s testimony, to the effect that he never heard, and never knew, of the matter charged, is wholly uncontradicted; the several witnesses who testified that they had participated in the game also testifying, explicitly, that they had not considered it their business to Inform defendant of its existence. He lived several miles away, upon the opposite side of the river, and had no occasion to pass the place either at night or on Sunday, in going to and from the courthouse.
8. Robert Otterman, one of the signers of the citizens’ “request,” and who obtained several other signatures, which were subsequently withdrawn, testified that a man named O’Dwyer conducted a lottery, patronized principally by negroes, near the protection levee, and about four squares from his (Otterman’s) residence; that, on two occasions, he gave a negro 15 cents to invest in tickets for him; and that the negro brought him pieces of paper with no numbers or headings, “just blank tickets,” which were said to be tickets in the lottery, but which won noth- • ing. He testifies that he saw negroes, in large numbers, congregated about, or coming out of *138 the place, and that he understood, from what he heard from them, that a lottery was being operated; also, that he drew that inference from some conversation with O’Dwyer ; that he never spoke of it to the police, the sheriff, the district attorney, or to any one; that he thought it would be useless. There were one or two other witnesses who testified on the subject, with about the same character of information; each stating quite positively that he had never complained, and one of them saying:
“It suited the people around there, and it suited me.”
Plaintiffs herein (meaning the citizens who signed the request that the suit be brought, and who are prosecuting it) appear to have been able to obtain information which never reached defendant, until this case was tried, and yet we doubt whether all the evidence adduced if presented in the prosecution of those individuals, would suffice to secure the conviction of either Hyland, Boudreaux, or O’Dwyer. As to O’Dwyer, defendant says in his testimony:
“Mr. O’Dwyer is a member of the board of school directors of this parish * * * elected by the people, and I have always considered him a gentleman and one of the most highly respected men in the parish. * * * I never would have thought that a man of Mr. O’Dwyer’s caliber would operate a negro lottery shop. Q. Did you ever hear his name mentioned in connection with it until this suit was brought? A. No, sir; I did not. * * * Q. Have you ever been able to get any evidence from anybody on this subject? A. Absolutely none.”
The lottery on the west bank of the river, at MeDonoughville, appears to have been conducted at the house of a negro woman, in a secluded place, and to have been patronized by negroes, save now and then, when a white man would give himself the trouble of seeking it out. Defendant denies that he had any knowledge of it, and' no one testifies to the contrary.
9. On January 23, 1909, the Times-Democrat sent a reporter to investigate the Mc-Donoughville lottery, and he testifies that he sent a negro, with 50 cents, to buy a ticket; that the negro brought him a ticket; that he sent the negro back to find out who were running the lottery; that, shortly afterwards, a man came up to him, put his arm on the shoulder of the witness, in a “decidedly menacing way,” and said, “You have to come with me, sport,” whereupon the witness struck him, and he struck witness with the butt end of a revolver; that, after they quit fighting, witness left, with the ticket; that an account of the affair, “with the exception of the names,” was published in the paper the next day; that he made no complaint to the district attorney; that, he thinks, he received a message to the effect that that officer desired to see him, at his office in New Orleans, but that he did not go to see him, in the first place, because he thought it would have been a farce to prosecute the man who assaulted him, in Jefferson, and, in the next place, because he did not regard the assault as personal, but as an encounter that he was obliged to engage in, in the line of Ms duty as a reporter. It is otherwise shown that defendant sent the message, from his office in New Orleans— which is but two or three squares from the office of the Times-Democrat — on the day of the publication to which we have referred; that, being unable to get any information from the reporter, he caused an affidavit and ■ an arrest to be made, but was unable to learn that any one had witnessed the affair; and that, as the published article gave no names, he was not thereby aided in his attempt to find out anything about either the lottery or the affray, and was obliged to abandon the prosecution.
10. The charge that, “from 1901 to 1910, slot machines were operated for money in almost every liquor saloon in the parish of Jefferson, all to the knowledge of District Attorney L. H. Marrero, Jr., who did noth *140 ing to enforce this law” (Act 57 of 1898), “or prosecute the violators of it, and that, at the time that the petition was prepared, such machines were being operated,” in the saloons of certain named persons, to the knowledge of defendant, is unsupported by the evidence; the facts being that the use of such machines had been, entirely, or almost entirely, suppressed some three years before the institution of this suit, and that, if, here and there, one should have been operated, it was done clandestinely and never came to the knowledge of defendant.
11. The charge that defendant aided and abetted flagrant violations of the law in “advising and counseling” the formation of social clubs, “so called,” is unsupported by the evidence. The charters of the so-called social dubs, which are mentioned in the petition, came to him in the usual course of his business, were drawn in the usual form, and were approved, because upon their faces, there was nothing that called for their disapproval. If they were used for an unlawful purpose, the persons so using them became liable to the penalties of the law, when convicted; but the possibility that a lawful charter may be used for an unlawful purpose would hardly justify the refusal of a district attorney to approve such charter.
12. The charge that defendant knowingly permitted fortune telling to be carried on, in violation of a prohibitory ordinance, is wholly unsupported; the facts being that defendant, of his own motion, drew up and caused to be adopted the ordinance referred to, and enforced it the moment that he had reason to believe that it was being violated.
It will be seen that the larger proportion of the specifications which we have thus considered relate to offenses, said to have been committed within defendant’s district, for which, it is alleged, he failed to prosecute, and, as to them, the charge would appear to be one of omission, neglect, or nonfeasance, apart from any corrupting influence or practice. Whether, in matters of that kind, an officer should be blamed, or should be punished by so serious a penalty as impeachment 'or removal, depends, partly, upon the point of view of those who undertake to judge him; for there are some who may think that the activities of a prosecuting officer should be concentrated for the suppression of particular offenses, as, for instance, the liquor traffic, or gambling, whilst others may think that those offenses may be left to themselves so long as the time and attention of the officers are occupied with eases of arson, murder, robbery, or labor disturbances. And again, in a case like this, where the office is an elective one, for which there is usually considerable competition, and about which, in connection with other matters and other offices, there may be a political contest, engendering great bitterness of feeling, those who are opposed to the incumbent are likely to judge him more harshly than those who support him, and the question of his guilt or innocence of the charge of nonfeasance in office becomes a matter of opinion, more or less prejudiced either way. It will be conceded, we imagine, that no prosecuting officer has yet been discovered who has succeeded in the suppression of all offenses against the law, in or about the larger cities of this country, or who has the time, or the means, to ferret out and prosecute all that he may have reason to suspect have been, or‘are being, committed-; from which it follows that he must, to a considerable extent, judge for himself of the relative importance, to the community which he serves, of the different matters to which he might devote his attention, and of the practicability, with the means at his command, of accomplishing results, in a particular direction, at a particular time, as compared with what he might accomplish in some other direction. In some parts of this state, where the material interests of the *142 communities are dependent on it, and there is a strong public sentiment behind him, a district attorney may, perhaps, rigidly enforce the Sunday law, the law prohibiting the sale of intoxicating liquors, or the law prohibiting gambling; whilst in other parts of the state, with no such (material) interests at stake and no public sentiment awakened, his efforts would amount to but the sounding of brass and the tinkling of cymbals.
In view of the considerations thus mentioned, it appears to us that, taking plaintiff’s charges with their disclaimer, we should, in connection with the investigation of the acts of omission and commission, upon which those charges are based, inquire somewhat into the general situation, as disclosed by the record — the conditions by which defendant has been surrounded, those under which the charges have been preferred, and the general results of his administration.
Defendant’s father was elected sheriff of the parish of Jefferson in 1896; has been reelected to that office at each quadrennial election since that time, including the election held in 1912, after a suit similar to this had been instituted against him, and thoroughly advertised; and, as will be readily understood, has been regarded as the Democratic leader in his parish, and one of the leaders in the several districts, judicial, congressional, etc., of which his parish forms a part.
Defendant was graduated from the Law Department of Tulane University of Louisiana in 1899, and, retaining his home at his father’s house, in the parish of Jefferson, entered upon the practice of law in the city of New Orleans (where he opened an office) and in the nearby parishes constituting the Twenty-Eighth judicial district. In 1904, he was elected district attorney of the district mentioned. In 1907, he was married, and, within a year, during which he occupied apartments in New Orleans, he built a residence and established a home on the Metairie Ridge, in the parish of Jefferson, about-1,000 feet from the Orleans parish line and conveniently located with reference to the New Orleans street railway system, by means of which he reached the city, and, through the city, his field of work, as district attorney. It is shown that he has, now, four children; that he is exceedingly domestic in his habits; and that, when not at his office or otherwise engaged in the discharge of his professional duties, he is usually to be found at home, which is about 2% miles (and in a direction which, as we understand, he does not often have occasion to travel) from the river, where Hyland’s gambling house and one of the lotteries mentioned in the petition are said to have been conducted. In 1908, defendant was re-elected to the office which he now holds. About midsummer in 1911, those who were interested began making their preparations for the elections which were to take place in 1912, and they resulted in the establishment, or revival, of an organization called “Good Government League,” composed of citizens whose membership was drawn mainly from the Democratic party and whose declared purpose was to better existing conditions, and, as a means to that end, to turn out the leaders who were in control and put others in their places. Branches of that organization were established in the parishes of the Twenty-Eighth judicial district, and the immediate object to which they appear to have directed their attention was the ousting of the Marreros from office. The leaders of the movement, in the parish of Jefferson, were gentlemen who had for years been affiliated with the Marreros, but who had, of late, fallen out with them and had lost, or were threatened with the loss of, certain official positions held by them. Dr. Gelbke, the late coroner of the parish, who, as a resident citizen *144 and taxpayer, signed' the request that this suit be brought and obtained a number of the other signatures, having taken the stand as a witness for relator, testified, in part, as follows:
“I really believe that I was the prime mover, because I wanted it” (the organization of a movement against the Marreros) “done several years ago. * * * Q. Isn’t it true that you only began to seriously try and get rid of the Marreros in the parish of Jefferson after you had lost office in the parish of Jefferson? A. Yes. Q. Then, when the people were deprived of your valuable services, and you no longer rode in the same political wagon with the Marrero faction, you got up this case for the purpose of getting rid of them through the court; that is right, isn’t it? A. Yes, sir. Q. And it is equally true, according to your testimony, that the law had been violated for a period of four, or five, or six. years? A. Yes. Q. And you had never lifted your voice or sought the people’s help to deprive anybody of office until you, yourself, had lost your job? A. We could never get enough together with sufficient courage"
Without exception, the signers of the request upon which the suit is based, and the witnesses called on behalf of relator, had aligned themselves with the political organization which opposed that led by the Marreros, and, almost without exception, those signers who did not withdraw their names were supporting relatives or connections for office, in the belief, no doubt, that they would make better officers than the candidates proposed by the Marrero faction. A few of the signers were called as witnesses for relator; the rest of them, over 20 in number, having been placed on the stand by defendant, “as upon cross-examination.” Some of them testified that they had knowledge that gambling was going on in the parish from having participated in it; others from having seen it, while in the establishments; others, from having heard of it; and, as a rule, they testified that they had signed the “request” because they wanted gambling suppressed. Each one of them testified that he had made no complaint and had given no information to the district attorney, or any other officer; and most of them testified that they did not consider it their business and did not believe it would do any good. About the only exception that we recall was a petitioner who stated that his main, if not his only, reason for signing, was that he had seen some factory children tossing nickels on the levee, and that, several months afterwards, he had spoken to a police officer about it, and felt insulted when the officer asked him why he had not done something about it at the time, or earlier. As against the testimony of plaintiff’s witnesses, tending to show that unsatisfactory conditions were notorious, quite a number of citizens, representing the largest planting, manufacturing, and mercantile interests in the parish, testified that all conditions relating to the protection of life and property have become incomparably better under the administration of the Marreros than they were before, and they give it as their opinion that the defendant is a faithful and efficient officer.
This suit was instituted on March 31, 1912, when the campaign which culminated in the general state election, in April, and the parish and judicial district primaries, in September, had reached a stage of acute acrimony and had enlisted general attention. The petition herein filed is a very elaborate one, setting out, in strong language, strong colors, and great detail, the charges and specifications which have been stated; and published, as it was, at such a moment, in several of the New Orleans papers, with “scare” headings, it should have been, and no doubt proved to be, a powerful campaign document. The Marreros were, nevertheless, returned to the offices for which they were candidates. In other words, after hearing plaintiff’s side of the case, and with little opportunity to hear the other side, juries consisting in the one case, of all the electors in the three parishes, and, in the other, of all the electors in the parish of Jefferson, *146 returned verdicts in favor of the two defendants thus placed on trial, incumbents of the offices of district attorney and sheriff. It is to be assumed that the verdicts thus returned at the polls were predicated upon views such as those expresed by the witnesses who testified in this case on behalf of defendant, and, in order to present those views a little more definitely, we summarize the testimony of one of the witnesses, as follows: Mr. Horace Harvey is manager of the Harvey’s Canal and also the Ferry Company. He testifies that the conditions in the parish of Jefferson, in the matter of the enforcement of law and order, are much better than they were before the Marreros were elected to office; that citizens are now able to prosecute those who violate the law, and get results, and can always get the assistance of the district attorney; that there are several thousands of persons at Harvey’s .Canal and several manufacturing concerns, with a thousand employés; that, before Marrero was elected sheriff, incendiary fires were matters of common occurrence, and the citizens were obliged to take the law into their own hands; that he (witness) could not come to Gretna (where the courthouse is situated) without carrying arms, a precaution which is no longer necessary; that even the main public road was dangerous; that, as soon as the Gay-Shattuck law was passed, he called on defendant, as district attorney, to enforce it, and got immediate relief; that, prior to the Marrero administration, they had great trouble with their labor, strikes, disorders, “blackhand,” and other, anonymous letters, and that, with the assistance of the district attorney and sheriff, they have gotten rid of their trouble; that, without their aid, he could have done nothing; that his life was at stake; that the makers of trouble were driven from the parish; that he has served on the grand jury, and has been foreman of that body; that it was charged on the subject of gambling, but they found it very difficult to find witnesses; that he meets, and has business with, many of the prominent business men of the parish; and that he and they, as he believes, are entirely satisfied with defendant’s administration of his office.
And there is much more to the same effect, which is corroborated by the testimony of J. A. Burbank, planter: Edward Godchaux, planter and manufacturer; A. Lasseigne, planter and president of the police jury, parish of St. John; P. G. Longy, planter; Joseph Rathbone, president of Lumber Company, employing great number of men; W. O. Humphreys, late manager of Union Oil Company, a concern owning “immense interests” in the parish; Charles N. Snipps, engineer of Southern Cotton Oil Company; John W. Todd, first vice president Union Oil Company and vice president Acid & Fertilizer Company; A. P. Sauer, connected with Seaboard Refining Company; Albert Fabaeher, dairy proprietor; James R. Meyers, manager Union Stave Plant; T. J. Sellers, planter in St. Charles parish; A. Madere, sheriff of St. Charles parish; Lezin Lanbeehe, planter in St. Charles parish.
We do not mean to intimate, by anything which has thus been said, that meeting and defeating objectionable public officers at the polls is not a good way to get rid of them. To the contrary, it appears to us to be a most excellent way. Nor do we mean to intimate that one who is opposing an objectionable officer, politically, may not be entirely sincere in the belief that the defeat of such officer will inure to the benefit of the public. The résumé, which we have made from the record, of the conditions under which this suit was instituted, was so made for the purpose of showing that all the instigators of the suit are on the opposite side from the defendant in a factional political controversy, and that the motives of some, at least, of those who have testified, may .have been, and, as we think, *148 were, inspired rather by a desire for factional success than for civil reform. Upon some of the specifications contained in the petition, those considerations have, of course, no bearing whatever. For instance, extortion in office is extortion, no matter who testifies to it or what may be his feeling; but whether, upon a given state of facts, the failure of a district attorney to find out that a particular offense is being committed and to prosecute the offender is malfeasance or nonfeasance, such as will justify his removal from office, is a question on which the testimony of witnesses is a good deal a matter of opinion, and the opinion is not unlikely to be influenced by feelings and prejudices which have nothing to ■do with the merits of the case.
It will be understood that, when a considerable proportion of the population of any community, reaching the conclusion that they need or desire a change in the personnel of the officers charged with the administration of the law, undertake to frame a bill of indictment against such officers, upon the basis of the offenses that have been ■committed and have gone unpunished during a period of, say, 8 or 10 years, the list of such offenses can readily be made an appalling one; but that much is true with regard to the best governed, as well as the worst governed, communities, and the question to be considered is: What proportion of the responsibility, in, such case, should be borne by the officers, and what proportion by the community? Where some of the members of the community become dissatisfied with the results accomplished by a particular officer, they may, if sufficiently numerous, choose another, in his place, at the. time and in the manner provided by law, merely to make room for an officer whom they think, or hope, may do better; but, when they undertake to remove such officer, by a method which carries with it, as a penalty, the fixing upon him of a stigma which he is to bear throughout his life, and which his children are to feel after his death, it becomes necessary to establish, with at least reasonable certainty, if not beyond reasonable doubt, the faults, of commission or omission, which, under the law, call for such penalty. In the instant case, those members of the community of which defendant is an officer who were dissatisfied with his administration invoked both remedies at the same time, They began their appeal to the entire community, perhaps a year in advance of the election, to defeat defendant at the polls; and, in the midst of a most active and acrid campaign, having that purpose in view, they caused this suit to be brought, thereby effecting a very strong combination, since the unproved allegations of their petition were used in aid of the political remedy, and the feelings engendered by the political campaign contributed to bring aid in support of the judicial remedy which they would not otherwise have obtained.
The entire community has acted in the matter, and, through the votes of its majority, has acquitted defendant and returned him to' office. For the reasons stated, our conclusion, upon the more definite aspects of the case, as presented to us, is that he should also be acquitted here. The judgment appealed from is, accordingly, affirmed.
The CHIEF JUSTICE and LAND, J., concur in the decree.