**UNITED STATES ex rel. MONTGOMERY
v. RAGEN.**

**No. 48 C 1564.**

United States District Court

N. D. Illinois, E. D.
Aug. 10, 1949.

Luis Kutner, Chicago, Illinois, for relator James Montgomery.

Ivan A. Elliott, Attorney General of the State of Illinois, and Raymond Thiesse, Assistant Attorney General, for respondent.

IGOE, District Judge.

This is a habeas corpus action brought by James Montgomery, relator herein, against Joseph E. Ragan, Warden of the Illinois State Penitentiary, Joliet, Illinois, respondent, to test the legality of his custody arising out of a judgment for conviction for the crime of rape by virtue of a true bill returned in The Circuit Court of Lake County, State of Illinois, filed January 2, 1924.

On October 26, 1948, the relator petitioned this court for writ of habeas corpus and in his prayer, amongst other things, requested the assignment of attorney Luis Kutner of Chicago, Illinois, as his counsel. Said counsel was appointed pursuant to order of court as amicus curiae.

█ Shortly after the filing of this petition and after notice to respondent, the respondent filed a motion to dismiss the petition and to deny the issuance of the writ of habeas corpus. Though the respondent attempted to descend to particulars in his motion to dismiss, it is in effect a general motion to dismiss and therefore by the very nature of the motion the re-spondent admitted the allegations well pleaded to be true. House v. Mayo, 324 U.S. 42, 65 S.Ct. 517, 89 L.Ed. 739; Williams v. Kaiser, 323 U.S. 471, 65 S.Ct. 363, 89 LEd. 398; White v. Ragen, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348. The petition was clearly sufficient on its face and after hearing and argument thereon the court entered an order on February 25, 1949, denying respondent's motion to dismiss and issued a writ of habeas corpus directed to the respondent. The respondent filed a return to the writ of habeas corpus, joining issue, and the matter was set for hearing which was had on June 27, 1949.

█ The petition having been filed in this court October 26, 1948, the court proceeded to hear and determine the matter in conformity with the new Federal Judicial Code, Title 28 U.S.C.A. "Judiciary and Judicial Procedure" approved June 25, 1948, effective September 1, 1948. The pertinent sections in the new code are an amplification under the prior Title 28 U.S.C.A. § 461 which provides: "The court, or justice, or judge shall proceed in a summary way to determine the facts of the case, by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice require."

The new code relating to habeas corpus is designed to minimize the rigid formality and is the liberal reflection of the Federal Judiciary in permitting those persons who contend they are illegally detained, to have their day in court.

The within matter was heard and determined pursuant to the new code, *Chapter 153* titled Habeas Corpus, *Sections 2241,* Power to Grant Writ: *2242,* Application: *2243,* Issuance of Writ: Return: Hearing: Decision: *2246* relating to Evidence: Depositions: Affidavits: *2247* relating to Documentary Evidence: *2248* relating to Return or Answer: Conclusiveness: *2249* relating to Certified Copies of Indictment: Plea and Judgment: Duty of Respondent.

The petitioner was permitted to sue in forma pauperis.

In essence Montgomery's verified petition alleges his indictment, sentence and

conviction, and that he has exhausted all available State remedies and writ of error is not available because the statutory period of limitations of twenty years has expired. People v. Chapman, 392 Ill. 168, 64 N.E.2d 529. Coram Nobis is not available inasmuch as the statutory period of limitations of five years has also expired. Hall v. People, 402 Ill. 478, 84 N.E.2d 418. Habeas corpus was filed in the Trial Court, namely, The Circuit Court of Lake County, State of Illinois, and was denied August 21, 1948, without opinion; certiorari was sought in the Supreme Court of the United States to review the denial of the habeas corpus proceedings and that was denied October 11, 1948, without opinion. 335 U.S. 836, 69 S.Ct. 28.

Montgomery further alleges that having exhausted all available State remedies he is remediless and a Federal Court should entertain this petition. Ex parte Davis, 318 U.S. 412, 63 S.Ct. 679, 87 L.Ed. 868; Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572; United States ex rel. Rooney v. Ragen, 7 Cir., 158 F.2d 346; United States ex rel. Mills v. Ragen, D.C., 77 F. Supp. 15; Washington v. Smyth, 4 Cir., 167 F.2d 658.

Though not alleged in the petition the record discloses that he also filed application for executive clemency praying for a pardon on or about October 1, 1947, which was subsequently denied.

The petition relies essentially upon matters de hors the record; namely, a hospital record and report of findings by Dr. John E. Walter, showing that Miss Snow was not raped, which record is in exact conformance with the hospital chart in the files of the Victory Memorial Hospital of Waukegan, Illinois. As various exhibits, he attaches a copy of the hospital record, an affidavit from Dr. John E. Walter in support of the hospital chart findings, and other documentary exhibits presenting a "totality of facts", Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595.

He contends briefly as follows—

1. The crime of rape was not committed against the person of Miss Mamie Snow on November 15, 1923, as charged in Cause No. 13722;

2. That he was unjustly and unlawfully indicted, convicted and sentenced for an alleged crime, which never occurred;

3. That the prosecuting authorities suppressed the evidence of Dr. Walter's physical examination of Miss Mamie Snow, which certainly would have proved that the crime of rape was never committed upon the person of Miss Mamie Snow, on November 15, 1923;

4. That petitioner did not know of the existence of the Hospital Chart and of Dr. Walter's examination and findings at the time of trial;

5. That petitioner was unaware and ignorant of the fact that Dr. Walter could or should have been called upon to testify at the trial as to the examination and findings he made upon the person of Miss Mamie Snow on November 15, 1923;

6. That petitioner's trial took place in the heyday of the Ku Klux Klan, and that he verily believes many Klansmen attended the trial of said cause, and that his attorney was either afraid or totally incompetent to properly represent him at the trial;

7. That his trial was a mere sham and pretense, and only a means of depriving him of his liberty without due process of law;

8. That he is not guilty of the alleged crime of rape upon the person of Miss Mamie Snow;

9. That he has not been guilty of negligence or delay in bringing these facts before the Court, having only of recent date been informed as to the existence of the Hospital Chart and Dr. Walter's Affidavit, which proof substantiates his claim of innocence of the alleged crime of rape, and a denial of due process of law;

10. That his conviction should not be suffered to stand—else he would be doomed to imprisonment for the duration of his natural life for an alleged crime which was never committed—having already served over twenty-four (24) years, though being totally innocent, and would be left without any legal remedy, either in the State or the Federal Courts;

11. That the entire affair was a "frame-up" and a hoax, concocted solely for the purpose of depriving petitioner of his rightful freedom and liberty.

## Jurisdiction.

After a review of the allegations in support of the exhaustion of available State remedies and after hearing and arguments thereon, this court finds that a Federal question of substance is properly before the court and that the petitioner has properly invoked the protective cloak of the due process clause of the Fourteenth Amendment of the United States Constitution. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 54, 56 S.Ct. 720, 80 L.Ed. 1033; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406; White v. Ragen, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348; Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572; Washington v. Smyth, 4 Cir., 167 F.2d 658.

## Evidence Adduced at the Hearing.

Dr. J. E. Walter who was the attending physician at the Victory Memorial Hospital at the time of the alleged offense testified that on November 15, 1923, he was called to the Hospital to examine Miss Mamie Snow, a white person. Miss Snow claimed that she had earlier been attacked and raped. Dr. Walter gave Miss Snow a thorough examination and discovered contusions about the head but otherwise no signs pointing to rape. Under questioning by Mr. Kutner, attorney for the relator, he testified:

"Q. At the time you first saw her on that date, did you observe her clothing. A. Yes Sir.

"Q. Was it disarrayed in any way? A. No, it was not.

"Q. You just observed some contusions, would you say? A. On the neck and face.

"Q. Did you examine her for evidence of rape? A. I did, yes.

"Q. Did you find any? A. I found no evidence at all of any rape.

"Q. You made a report of that?[1] A. Yes.

"Q. And your report, to your knowledge, was communicated to the police, is that right? A. Yes."

Dr. Walter also testified that from his examination of Miss Snow, he determined that she had been and remained a virgin. He further stated that he and his wife had known Miss Snow for a year or two prior to November 15, 1923, as she had been a door to door peddler of notions, needles, and thread, and had called at his home from time to time. During these visits, Miss Snow would engage Dr. and Mrs. Walter in conversations of a highly irrelevant nature and the Doctor had noticed peculiarities about her speech and manner leading him to believe that she was mentally irresponsible; nevertheless, she appeared harmless and the Doctor and his wife often made purchases from her.

He further testified upon re-direct examination that he was available at the time of Montgomery's trial but was not called as a witness.

I. Relator's Exhibit No. 1.
   Copy of Victory Memorial Hospital Record of Miss Mamie Snow, No. 5441
   11–15—Treatment—Hot B. A. Sol. compress to left eye every three hours.— Dr. Walter.
           Personal History
   11–16–23—Dr. Walter.
   Final Diagnosis; Contusion over eyes and nose; mouth and throat.
   Chief complaint: Attacked by Negro.
           Physical Examination
   11–16—Dr. Walter.
   Working Diagnosis: Contusion of face and throat.

   Physical Findings: Contusions. Bruises over eyes and nose.
   Lacerated mouth and throat.
   Copied from Hospital Chart 6–24–47 for
               Arthur C. McHenry, Attorney
               4 South Genesee Street
               Waukegan, Illinois
   I certify that the above is a true and exact copy of the Hospital Chart on Miss Mamie Snow.
               /a/ U. Phillips
               Superintendent.
   clc
   Mary J. McMahon
   (Seal)

James Montgomery, a colored person, the relator herein, testified that at the time of his arrest on November 15, 1923, he could neither read nor write, had been married for three years, had served fourteen months in the army, and had never been in difficulty with the police.

He further testified that while at the police station, following his arrest, he was assaulted by the police, which beating left scars on his face and forehead visible to the present day. The morning after his arrest, he was presented to Mamie Snow, who was asked, "Did you see this fellow before?" Miss Snow answered, "I never saw this fellow before in my life."

That at a preliminary hearing requested by him to give bond, the States Attorney warned Montgomery away from such efforts by saying, "If you were down in Georgia or Mississippi where you come from, we would turn you over to the Ku Klux Klan and we are liable to do it up here now, you know I am a member of that organization." This was sufficient persuasion to the relator not to attempt to make bond and he was returned to his cell to await further developments.

He further testified that his attorney was frightened, and though twelve persons were able to testify that he had been far from the scene of the alleged crime, and repeatedly asked to have them brought in, his attorney, submissive to the threats of the States Attorney, refused to bring them in. The States Attorney went so far as to threaten Montgomery with prompt action by the Klan if he took the stand in his own behalf. He further testified on cross-examination that his trial lasted twenty minutes.

From the foregoing evidence it can be reasonably inferred that the States Attorney and his agents were well aware of the examination of Mamie Snow by Dr. Walter, his medical conclusions, and report thereof, but either because of gross dereliction of duty or wrongful suppression of such evidence by the prosecution, James Montgomery was convicted of a crime never committed and sentenced to life imprisonment in the State Penitentiary.

Exhibit 2. which is a transcript of the common law record in the original trial was admitted into evidence.

The court was singularly impressed with Exhibit 3. which was received in evidence, to wit:

"Affiadvit of Court Reporter

"Bert McDermott, being first duly sworn upon oath deposes and says, that he is the Official Court Reporter of the Circuit Court of Lake County, Illinois, and was the Court Reporter in the case of The People of the State of Illinois—vs—James Montgomery, General No. 13722, in the Circuit Court of Lake County, Illinois; that he has made diligent search among his official files for the stenographic report of the proceedings upon the hearing of said cause but has not been able to locate the same; that his stenographic report of the evidence, either oral or documentary, that was introduced upon the trial of said cause are missing from his custody and cannot be found."

The respondent offered no evidence in defense or in resistance to the writ of habeas corpus, nor to the oral and documentary evidence adduced.

Rape is looked upon by all mankind as one of the most infamous and dastardly of crimes known to the law. A defendant charged with such a crime carries a heavy burden. If colored, his burden becomes more acute and more aggravating, especially where the charge is made by a white prosecutrix. Unfortunately, we have not progressed far enough in our path toward the civilized standards which places the colored man on equal footing with that of the white man. Social offenses are committed against the Negro by methods of segregation, ostracism, and other subterfuges—all designed to deprive him, though he be a native born citizen of the United States, from the just rights and protective cloaks guaranteed to him by the Constitution of the United States.

In the case at bar, at the time of the conviction, we have the unblemished record of James Montgomery, 26 years old, a law abiding property owner, married and a respected member of his community. We

have evidence that he served his country in World War I. We have also in the record—which is uncontradicted—the background of the intense hatreds, fomented and localized at the time of the alleged offense, in Lake County in which North Chicago and Waukegan are situated. The respondent has brought nothing forward to defend against the charges made in the verified petition for writ of habeas corpus filed by the relator. If there was a shred of evidence to contradict and defend against the relator's charges, sufficient time was afforded to the respondent to bring forward and present evidence in defense of the accusations made.

■ We have the uncontradicted evidence that the prosecuting witness was a person of irresponsible mentality and was later confined to a mental institution where she died. The testimony of such a prosecuting witness in any field of litigation should be of little credence; yet without her testimony the case against James Montgomery would have collapsed and should have collapsed had the prosecuting attorney exercised the degree of impartiality and fairness which is his own sworn duty in the rendition of true justice. It is his duty to bring forward all facts to the Court's and jury's attention so that a true consideration may be made in the interest of justice.

■ A prosecutor is supposed to be an impartial representative of public justice. The methods employed by the prosecution at Lake County in 1924 represents as shocking a situation as ever before presented before this court. A society cannot suppress lawlessness by an accused through the means of lawlessness of the prosecution. A society cannot inspire respect for the law by withholding its protection from those accused of crimes. It was and is the prosecuting attorney's duty to assist in giving a fair trial to a defendant. Read v. United States, 8 Cir., 42 F.2d 636; Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. A prosecutor must, to be fair, not only use the evidence against the criminal, but must not willingly ignore that which is in an accused's favor. It is repugnant to the concept of due process that

a prosecutor introduce everything in his favor and ignore anything which may excuse the accused for the crime with which he is charged. It is manifest in this matter that some one identified with the prosecution, as the circumstances indicate very clearly, ignored a material piece of evidence which, if it had been brought to the attention of the jury or the trial judge, would certainly have resulted in the acquittal of this relator. There is evidence in the record sufficiently to indicate that circumstantial vital evidence was brought to or available for the prosecution. The prosecution is charged with the knowledge of what was contained in the certificate of findings by Dr. John E. Walter. The respondent conceded the authenticity of the hospital record. Presenting the obverse, another Judge has said—"Though unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained is unjust and dangerous to the whole community." Hurd v. People, 25 Mich. 405.

To condone the methods evident in this case, is to invite grave injustice. There is one way to stop a practice that has become altogether too common—and that is to bring it to a conscious level where the public can scrutinize it and take such steps as are necessary to insure a true rendition of justice to all, regardless of race, color or creed.

■ The relator, James Montgomery, has gone the merry-go-round of Illinois justice and has failed to get a hearing, or even a suggestion of a hearing on the serious charges he has made. His conviction was secured by the use of false testimony, fraud, and suppression of vital evidence which are a denial of due process, and a direct violation of the Fourteenth Amendment. Shelley v. Kramer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441; Brown v. Mississippi, 297 U.S. 278, 56 S. Ct. 461, 80 L.Ed. 682; Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406.

■ There was no trial here, but a sham, one of false pretenses and fraud. The Law is established that habeas cor-

388

pus lies in a case where a conviction has been in disregard of the Constitutional Rights of the accused and where the writ is the sole effective means of protecting his rights. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406; Hysler v. Florida, 315 U.S. 411, 316 U.S. 642; 62 S.Ct. 688, 86 L.Ed. 932; United States ex rel. Lesser v. Hunt, 2 Cir., 117 F. 2d 30; House v. Mayo, 324 U.S. 42, 65 S.Ct. 517, 89 L.Ed. 739.

■ The due process clause of the Fourteenth Amendment embraces the re-requirement that no trial should deprive a defendant of the constitutional safeguards which are of fundamental importance, and a necessary part of a "fair trial". The unjustified and illegal punishment of James Montgomery is a clear demonstration of violence to the American concept of due process of law.

The relator has invoked the primary and irresistible strength of the writ of habeas corpus. The writ has long been the sword and shield in the long struggle for freedom and constitutional government. It is a potent weapon against tyranny in every form and guise. It is the weapon against tyranny of the ruling majority who are heedless of the justice and rights of minorities. It is the bulwark of a citizen against suppressed evidence that tends to give justice elusive qualities that become illogical and dangerous attacks on the fundamental principle of our democracy. It brings to book those who display scornful reference to human rights.

■ That the relator, James Montgomery, properly invokes the due process clause of the United States Constitution, it is clearly sustained by the evidence. Due process, in short, means fair play. Due process of law is that process of impartial law which is binding because it is right. It senses the mistakes of the past and wants to rectify them. It provides men with faith. As stated in People v. Bimbo, 314 Ill. 449, 454, 145 N.E. 651, 653. "A defendant charged with crime has a right to a fair and impartial trial according to law, and the law does not *provide one method for trying innocent persons and anoth-* *er for trying guilty persons, as all persons charged with crime are presumed to be innocent until they are proven guilty beyond a reasonable doubt according to the established methods of procedure.* People v. Gardiner, 303 Ill. 204, 135 N.E. 422; People v. Newman, 261 Ill. 11, 103 N.E. 589. The state's attorney is a sworn officer of the court, and it is his official duty to see that the defendant has such fair and impartial trial. While errors are sometimes committed by counsel through eagerness to win a lawsuit, yet there is nothing *in the duty of a state's attorney which requires him to prejudice the right of a defendant to a fair trial in an eagerness to secure a conviction.* People v. Sorrells, 293 Ill. 591, 127 N.E. 651. " (Emphasis supplied.)

■ Due process also identifies itself with due course of justice, and that phrase "means not only the due conviction and punishment, or the due acquittal and discharge, of an accused person as justice may require, but is also the due course of proceedings in the administration of justice. * * *" Shackelford v. Commonwealth, 185 Ky. 51, 214 S.W. 788, 789.

In Adamson v. People of California, 332 U.S. 46, 67 S.Ct. 1672, 1682, 91 L.Ed. 1903, 171 A.L.R. 1223, the Court, through Justice Frankfurter, stated:

"It may not be amiss to restate the pervasive function of the Fourteenth Amendment in exacting from the States observance of basic liberties. See Malinski v. New York, 324 U.S. 401, 412 et seq., 65 S. Ct. 781, 786, 89 L.Ed. 1029; State of Louisiana v. Resweber, 329 U.S. 459, 466, et seq., 67 S.Ct. 374, 377 [91 L.Ed. 422].

"The Amendment neither comprehends the specific provisions by which the founders deemed it appropriate to restrict the federal government nor is it confined to them. The Due Process Clause of the Fourteenth Amendment has an independent potency, precisely as does the Due Process Clause of the Fifth Amendment in relation to the Federal Government. It ought not to require argument to reject the notion that due process of law meant one thing in the Fifth Amendment and another

in the Fourteenth. The Fifth Amendment specifically prohibits prosecution of an 'infamous crime' except upon indictment; it forbids double jeopardy; it bars compelling a person to be a witness against himself in any criminal case; it precludes deprivation of 'life, liberty, or property, without due process of law.' Are Madison and his contemporaries in the framing of the Bill of Rights to be charged with writing in a meaningless clause? To consider 'due process of law' as merely a shorthand statement of other specific clauses in the same amendment is to attribute to the authors and proponents of this Amendment ignorance of, or indifference to, a historic conception which was one of the great instruments in the arsenal of constitutional freedom which the Bill of Rights was to protect and strengthen.

"A construction which gives to due process no independent function but turns it into a summary of the specific provisions of the Bill of Rights would, as has been noted, tear up by the roots much of the fabric of law in the several States, and would deprive the States of opportunity for reforms in legal process designed for extending the area of freedom. It would assume that no other abuses would reveal themselves in the course of time than those which had become manifest in 1791. Such a view not only disregards the historic meaning of 'due process,' it leads inevitably to a warped construction of specific provisions of the Bill of Rights to bring within their scope conduct clearly condemned by due process but not easily fitting into the pigeon holes of the specific provisions. It seems pretty late in the day to suggest that a phrase so laden with historic meaning should be given an improvised content consisting of some but not all of the provisions of the first eight Amendments, selected on an undefined basis, with improvisation of content for the provisions so selected.

"And so, when, as in the case like the present, a conviction in a State court is here for review under a claim that a right protected by the Due Process Clause of the Fourteenth Amendment has been denied, the issue is not whether an infrac-

tion of one of the specific provisions of the first eight Amendments is disclosed by the record. The relevant question is whether the criminal proceedings which resulted in conviction deprived the accused of the due process of law to which the United States Constitution entitled him. Judicial review of that guaranty of the Fourteenth Amendment inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English speaking peoples even toward those charged with the most heinous offenses. These standards of justice are not authoritatively formulated anywhere as though they were prescriptions in a pharmacopoeia."

In Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, the court defined denial of due process as "the failure to observe that fundamental fairness essential to the very concept of justice."

Even in a case where the perjury was unknown, as claimed by the prosecuting officers until some time after the trial, a federal court has determined that the conviction was in violation of the 14th Amendment and released the petitioner upon a writ of habeas corpus. In the case of Jones v. Commonwealth of Kentucky, 97 F.2d 335, Judge Simons, speaking for the Circuit Court of Appeals, Sixth Circuit, said, at page 338: "The concept of due process as it has become crystallized in the public mind and by judicial pronouncement, is formulated in Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 342, 79 L.Ed. 791, 98 A.L.R. 406. Its requirement in safe-guarding the liberty of the citizen against deprivation through the action of the state embodies those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' referred to in Hebert v. Louisiana, 272 U. S. 312, 316, 317, 47 S.Ct. 103, 71 L.Ed. 270, 48 A.L.R. 1102. This requirement cannot be satisfied 'By mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defend-

ant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by the state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.' If it be urged that the concept thus formulated but condemns convictions obtained by the state through testimony known by the prosecuting officers to have been perjured, then the answer must be that the delineated requirement of due process in 'the Mooney Case embraces no more than the facts of that case require, and that the 'fundamental conceptions of justice which lie at the base of our civil and political institutions' must with equal abhorrence condemn as a travesty a conviction upon perjured testimony if later, but fortunately not too late, its falseness is discovered, and that the state in the one case as in the other is required to afford a corrective judicial process to remedy the alleged wrong, if constitutional rights are not to be impaired."

The Jones case was approved by the Circuit Court of Appeals for the Seventh Circuit in the recent case of Kelly v. Ragen, 129 F.2d 811, 814, wherein Judge Sparks, speaking for the court, said—"A recent case which well illustrates the type of urgent necessity justifying the issuance of the writ is Jones v. Commonwealth of Kentucky, 6 Cir., 97 F.2d 335, 336."

The facts in this case present a situation almost identical with that before the court in the case of Jones v. Commonwealth of Kentucky, 6 Cir., 97 F.2d 335. In both cases, petitioners were convicted and have served a substantial portion of their lives in the penitentiary. In both cases the perjury at the trial was first discovered by the convicted persons many years after the trial. In both cases the perjured testimony was vital to the prosecution's case. In both cases the petitioners had exhausted all of the legal remedies available to them under the laws of the State of their incarceration. In both cases the only remaining State avenue to correct the manifest injustice, pardon by the Governor, was closed. In the Jones case the perjury at the trial was not discovered until many years after the trial. In this case many facts convince me that some of the prosecuting officers knew at the time of the trial that Mamie Snow was committing perjury. In a case of this nature one would not expect to find direct proof of the connivance of the prosecution in the use of perjured testimony, and the circumstantial evidence presented is as strong as could reasonably be expected. However, even if this evidence of knowing use of perjured testimony was not in the case, I believe that even on the authority of the Jones case, this petitioner should be discharged.

The corruption of administrative processes set in motion forces which deprived relator of due process of law.

■ Corruption is an act of an official or fiduciary person who wrongfully acts contrary to duty and to the rights of others. State v. Shipman, 202 N.C. 518, 163 S.E. 657, 669. Its effect vitiates the basic integrity and purity negativing that which is vital to the due course of justice. State v. Marrero, 132 La. 109, 61 So. 136, 140, Ann.Cas.1914C, 783.

## Conclusions of Fact.

That the conclusions of fact set forth in the foregoing are herewith adopted as final, and in addition thereto, the Court specifically further finds:

1. That Mamie Snow was not raped on November 15, 1923, by James Montgomery, or any other person;

2. That Dr. John E. Walter, by his examination of Mamie Snow on November 15, 1923, determined that she had not been raped;

3. That Dr. Walter made a written report of the examination in which he showed that Mamie Snow had not been raped;

4. That the prosecution either knew, or should have known, of Dr. Walter's examination and report—in fact they are charged with the knowledge;

5. That in spite of this knowledge, the state authorities of Lake County, Waukegan, Illinois, brought a criminal action for rape against James Montgomery;

6. That at the trial of the relator, the evidence of Dr. Walter's examination and report were wrongfully suppressed by the prosecution;

7. That the States Attorney by threats of intimidation prevented any witnesses from testifying in behalf of James Montgomery;

8. That Mamie Snow was mentally incompetent and her testimony at the trial of James Montgomery was totally false;

9. That the States Attorney knew, and was charged with the knowledge, that the testimony of Mamie Snow was false and yet wrongfully used her testimony to convict James Montgomery;

10. That the trial of James Montgomery was a sham in that—

a. The States Attorney dominated the entire proceeding;

b. The States Attorney threatened retaliation by the Ku Klux Klan if the defendant or his counsel attempted to offer any defense;

c. The issue at the trial was not the guilt or innocence of the crime of rape—but that of racial subjugation.

## Conclusions Of Law.

That the conclusions of law set forth in the foregoing are herewith adopted as final, and in addition thereto the court specifically finds:

1. That the relator has now exhausted all remedies available to him in the Illinois Courts;

2. That this court has jurisdiction of the person and subject matter in that the relator has exhausted his state remedies and has alleged substantial violations of his federal rights;

3. That the wrongful suppression by the prosecution of evidence which unquestionably would have established the innocence of James Montgomery was a denial of due process in violation of the Fourteenth Amendment to the United States Constitution;

4. That the States Attorney by knowingly presenting false testimony to convict James Montgomery, did deny to him due process of law in violation of the Fourteenth Amendment to the United States Constitution;

5. That the unlawful sham purported to be a trial was a denial of due process in violation of the Fourteenth Amendment to the United States Constitution;

6. That because James Montgomery was denied due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution, his conviction and sentence thereunder are void and relator should be discharged;

7. That this case comes squarely within the rule of being tested and appraised by the totality of facts.