William B. BARBEE, Appellant,

v.

WARDEN, MARYLAND PENITEN-TIARY, Appellee.

No. 9063.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 13, 1964.

Decided April 29, 1964.

Charles Yumkas, Baltimore, Md. (Court-assigned counsel), for appellant.

Loring E. Hawes, Asst. Atty. Gen. of Maryland (Thomas B. Finan, Atty. Gen. of Maryland, on brief), for appellee.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and BARKSDALE, District Judge.

SOBELOFF, Chief Judge.

The appellant contends that his conviction in a Maryland state court should be set aside on federal habeas corpus because the prosecutor failed, either through lack of his personal knowledge or for some other reason, to disclose at the trial potentially exculpatory evidence in the possession of the police, thereby causing prejudice to the appellant.

On April 12, 1957, William Barbee was arrested for shooting Jimmy McGee a few days earlier. The police gained possession of a .32 calibre revolver which, according to admissions made by Barbee to the police and repeated at the trial, belonged to him.

Approximately one week later, while in jail awaiting disposition of the McGee case, Barbee was placed in a "line-up" and identified by Officer Donald Fisher of the Baltimore City Police Department as the man who had shot him thirteen months earlier. On the strength of this identification the petitioner was indicted for assault with intent to murder and for unauthorized use of a motor vehicle. The trial was for the 1956 Fisher shooting and for the charge of unauthorized use of an automobile. The petitioner had pleaded guilty and was awaiting sentence on the charge arising from the more recent McGee incident.

At the state trial the following chronology was developed through the testimony of Officer Fisher and two eyewitnesses.[1] On March 6, 1956, the officer was called to assist two persons who were attempting to subdue a man they suspected of having stolen an automobile belonging to one of them. The officer placed the suspect under arrest and took him to a call box. There the man drew a gun, shot the officer, and fled. At the trial more than a year later on May 16, 1957, three witnesses for the state, namely, the officer and the two persons who had called on him for assistance, identified Barbee as the gunman.

Each of the witnesses was shown Barbee's revolver and asked whether he had seen it before. In each instance the witness answered that the revolver exhibited to him was "similar" to the one used in the Fisher shooting, but he was unable to make a positive identification. The weapon was not actually introduced in evidence, but according to the court reporter's account, was offered by the prosecutor for "identification purposes only." Barbee was found guilty.[2]

1. Unfortunately, no transcript of the proceedings in the state court is available. But the court reporter read from his notes of the state trial at the federal habeas corpus hearing and this, plus the statement of facts to which the parties have agreed, permits a virtually uncontested reconstruction of the testimony at the trial.

2. Barbee was sentenced simultaneously for all three offenses, namely, fifteen years for the 1956 assault on the police officer, four years for the related larceny of the motor vehicle, and one year for the 1957 McGee assault, the sentences to be served consecutively—a total of twenty years.

No direct appeal was taken, but in due course appropriate state post-conviction relief was sought and denied. Application for federal habeas corpus then followed. The District Judge appointed a lawyer for the petitioner and held a plenary hearing. Concluding that no constitutional right of the petitioner had been abridged, the petition was denied.

Throughout the state and federal post-conviction proceedings Barbee has maintained that he was deprived of due process at his trial. He claims, and the transcript of the federal hearing provides substantiation, that the prosecution produced his revolver in court, offered it for identification and elicited from state witnesses incriminating statements in respect to it without disclosing at any time to the court or to defense counsel reports of ballistics and fingerprint tests made by the police department. These reports cast grave doubt upon Barbee's involvement in the Fisher shooting. Nondisclosure of these documents, he says, was fundamentally unfair notwithstanding the fact that it is not shown that the State's Attorney was himself guilty of an intentional suppression. Indeed, there is nothing to indicate that this official had been told by the police of the existence of the reports.[3]

The state makes a four-pronged answer. Its position is that the appellant is entitled to no relief because he has failed to show: (1) that the undisclosed evidence had any probative value; (2) that his counsel ever asked that the results of the tests be revealed to him or the court; (3) that the prosecuting attorney had any knowledge of the existence of the reports; or (4) that any prejudice resulted from the nondisclosure.[4] We shall deal with each of these contentions.

*First.* That the police reports in question had substantial evidentiary significance is made plain by the testimony of Lieutenant Epple of the Police Department Crime Laboratory at the federal habeas corpus hearing. He stated that Barbee's fingerprints had been submitted to the laboratory for comparison with those found on the automobile driven by Officer Fisher's assailant, and the results were negative. In addition, he read from the ballistics report an account of the police investigation of the crime and the discovery of two spent bullets, one retrieved on the street near the call box, the other found in Officer Fisher's false teeth. From the tests performed on these bullets and the test shots fired with Barbee's revolver, the police report concluded that this weapon was "not wanted in any pending cases in our file." Lieutenant Epple specifically testified that, according to this report, neither of the bullets could have come from Barbee's pistol which the prosecutor had presented in court "for identification." His testimony was that Barbee's gun was a .32 calibre Iver-Johnson, while one bullet recovered from the automobile at the scene of the shooting was .38 calibre, and the object recovered from the officer's false teeth was described as "a part of a bullet" with no further description as to its calibre or otherwise.

3. Concededly, it would have been a denial of due process if the prosecutor had obtained a conviction either by the knowing use of false material testimony or by the intentional suppression of evidence. See, e. g., Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); Reickauer v. Cunningham, 299 F.2d 170, 172 (4th Cir.),

cert. denied, 371 U.S. 866, 83 S.Ct. 127, 9 L.Ed.2d 103 (1962).

4. The Attorney General has not relied in this court on the ground assigned by the Court of Appeals of Maryland for denying relief, namely, waiver by failing to take a direct appeal. Doubtless the Attorney General did not press this ground because of the later decision of the Supreme Court in Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and because the defendant did not learn of the police reports until after he had started to serve his sentence.

In our view, all of this evidence tending to exculpate the petitioner became highly relevant the instant his revolver was produced in open court, formally marked for identification, and witnesses interrogated about it.[5] Presenting the gun, without explanation or qualification, could not fail to suggest an inference that this was the weapon used to commit the offense for which Barbee was on trial. If this was not meant to be suggested, there was no reason, indeed no justification, whatever for its formal production at the trial. Once produced, it became not only appropriate but imperative that any additional evidence concerning the gun be made available either to substantiate or to refute the suggested inference.[6] If the pistol was pertinent for any purpose, so also was the opinion of the ballistics expert that it was not the weapon used in the Fisher shooting. We cannot say that the trier of fact would have given no weight to the ballistics report or the expert's testimony. As Judge Edgerton said in Griffin v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990, 993 (1950):

> "[T]he case emphasizes the necessity of disclosure by the prosecution of evidence that may reasonably be considered admissible and useful to the defense. When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful."

*Second.* It is no answer that Barbee's attorney failed to ask for the results of the tests. While a diligent defense counsel might have learned about the police reports, this is too speculative a consideration to outweigh any unfairness that actually resulted at the trial.[7] He may not have known that tests were made. Indeed he may have been misled into thinking that the tests, if made, supported the state's theory and were adverse to his client, and that otherwise the State's Attorney would not have produced the gun in court.[8]

---

5. See, e. g., United States ex rel. Thompson v. Dye, 221 F.2d 763, 767 (3d Cir.), cert. denied, 350 U.S. 875, 76 S.Ct. 120, 100 L.Ed. 773 (1955); United States ex rel. Almeida v. Baldi, 195 F.2d 815, 820, 33 A.L.R.2d 1407 (3d Cir. 1952), cert. denied, 345 U.S. 904, 73 S.Ct. 639, 97 L. Ed. 1341 (1953); Griffin v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990, 992 (1950); United States ex rel. Montgomery v. Ragen, 86 F.Supp. 382, 387 (N.D. Ill.1949).

6. E. g., Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); Turner v. Ward, 321 F.2d 918, 920 (10th Cir. 1963); Ashley v. State of Texas, 319 F. 2d 80, 85 (5th Cir. 1963).

7. See United States ex rel. Thompson v. Dye, 221 F.2d 763, 768 (3d Cir.), cert. denied, 350 U.S. 875. 76 S.Ct. 120, 100 L.Ed. 773 (1955); Note, 60 Colum.L. Rev. 858, 861 (1960). See also United States ex rel. Meers v. Wilkins, 326 F.2d 135, 140 (2d Cir. 1964).

8. It has been suggested that Barbee's original attorney may have known of the existence of the reports. In the memorandum opinion of the state judge who denied Barbee post-conviction relief the following statement appears: "He was represented by counsel; the testimony regarding the finger prints and the ballistic test was well known to the Petitioner's counsel * * *." Also, during the course of the federal hearing the District Judge remarked that he accepted the state judge's findings as to the fingerprints. No mention was made of the more important evidentiary item, the ballistics report.

However, there is nothing whatever in the record to support the conclusion announced by the state judge. In fact, this conclusion was reached six years after the trial in the criminal court, and four years after the denial of relief under the state post-conviction act, and without the benefit of a trial transcript.

The state court had denied Barbee's first petition on February 3, 1959, erroneously declaring that the original conviction was upon "a statement of facts by the State's Attorney." This error was inadvertently adopted by the Maryland Court of Appeals. See Barbee v. Warden, 220 Md. 647, 151 A.2d 167 (1959). When the federal court received Barbee's application for federal habeas corpus, this error was called to its attention. The District Judge suspended proceedings in his court pending reopening of the case

This is not a case where defense counsel merely made a wrong tactical calculation; it is a case where the inference strongly projected by the state's evidence might have been destroyed by other evidence in its possession but which the police concealed from the court, from defense counsel, and perhaps also from the State's Attorney. In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel.

■ *Third.* Nor is the effect of the nondisclosure neutralized because the prosecuting attorney was not shown to have had knowledge of the exculpatory evidence. Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty

of the nondisclosure.[9] If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. "The cruelest lies are often told in silence." If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging.[10]

The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused. We cannot condone the attempt to connect the defendant with the crime by questionable inferences which might be refuted by undisclosed and unproduced documents then in the hands of the police. To borrow a phrase from Chief Judge Biggs, this procedure passes "beyond the line of tolerable imperfection and falls into the field of fundamental unfairness."[11]

---

in the state court. The state court thereupon heard testimony from the police lieutenant and the prisoner, and affirmed the original dismissal of the petition with the above-mentioned additional comment as to the lawyer's knowledge.

It is baffling how the state judge could conclude that the original lawyer knew of the reports, since the judge did not have before him a transcript of the trial held six years earlier—a trial conducted before another judge.

9. See Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); United States v. Lawrenson, 298 F.2d 880, 888 (4th Cir.), cert. denied, Lawrenson v. United States Fidelity & Guaranty Co., 370 U.S. 947, 82 S.Ct. 1594, 8 L.Ed.2d 812 (1962); Curran v. State of Del., 259 F.2d 707 (3d Cir. 1958), cert. denied, 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959).

10. See United States v. Consolidated Laundries Corp., 291 F.2d 563, 570–571 (2d Cir. 1961). See also Curran v. State of Del. supra n. 9; United States ex rel. Montgomery v. Ragan, 86 F.Supp. 382 (N.D.Ill.1949).

11. Curran v. State of Del., 259 F.2d 707, 713 (3d Cir. 1958), cert. denied, 358 U.S.

948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959). See Cahn, "Law in the Consumer Perspective." 112 U.Pa.L.Rev. 1, 9–12 (1963).

See also the recent case of Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), which differs from ours in that it dealt with a suppression of evidence favorable to the accused after a request for its production, but the Court's language is highly pertinent:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

\* \* \* \* \*

A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not 'the result of guile,' \* \* \*."

■ *Fourth.* With respect to the necessity for a showing of prejudice, the cases sometimes draw a distinction between the knowing use of false testimony and the passive nondisclosure of exculpatory evidence. In the first type of case the sentence will be set aside without inquiring into whether the defendant has been prejudiced, while in the latter some consideration of the possible effect of the irregularity upon the fairness of the trial is necessary. How strong a showing is required in a given case will depend on the nature of the charge, the testimony of the state, and the role the undisclosed testimony would likely have played.[12]

■■ In a recent case, where items of evidence had been erroneously admitted, the Supreme Court declined to speculate that the error might have been harmless in the face of sufficient, properly-admitted evidence upon which the defendant could have been convicted. Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). In the present case, where evidence was withheld by the police which had a direct bearing upon and could reasonably have weakened or overcome testimony adverse to the defendant, we will not indulge in the speculation that the undisclosed evidence might not have influenced the fact finder.[13] "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." 375 U.S. at

86–87, 84 S.Ct. 230, 11 L.Ed.2d 171. Involved is a question of fundamental fairness rising to the level of constitutional due process which cannot be brushed aside as a mere error in an evidentiary ruling.

Admittedly, the eyewitness identification, resting on year-old memories, would, if accepted, be legally sufficient. However, because of the lapse of time from the event to the recall, the trier of fact might well have entertained reservations as to the accuracy and reliability of this testimony. All doubt might have been removed by the seeming corroboration of the gun produced in court. While such corroboration was itself subject to overthrow by the ballistics report, the police department maintained silence. The report might not have been proof of the defendant's innocence, but if its contents had been made known, it might well have nurtured, even generated, a reasonable doubt as to guilt. One cannot possibly say with confidence that such a defect in the trial was harmless. A procedure so burdened with the tendency to harm accords a defendant less than due process.

Accordingly, the decision of the District Court is reversed and the case remanded for the issuance of a writ of habeas corpus unless the state elects to retry the defendant within a reasonable time, in which case he shall remain in custody pending such new trial.

*Reversed and remanded with directions.*

12. Kyle v. United States, 297 F.2d 507, 513–514 (2d Cir. 1961); Application of Kapatos, 208 F.Supp. 883, 887–888 (S.D. N.Y.1962); Note, 60 Colum.L.Rev. 858, 863–65 (1960).

13. "In many cases the most damaging evidence against defendants are the fingerprints on a weapon, a scientific report on bloodstains, a ballistics test or an autopsy report. Even if these reports may not be admissible at trial, their results often prove innocence as well as guilt, and for that reason, may be quite vital to the defense for impeachment purposes. The state has unlimited access to modern scientific aids and it is making more and more use of these devices. The defendant is often innocent and generally cannot afford to make independent tests on his own. Grave injustice may be done if scientific studies which tend to show innocence are never made known to defense counsel and are never introduced at trial. Because of the great probative value of such tests or reports * * * [they should] be freely discoverable." Note, 42 Neb.L.Rev. 127, 131–32 (1962).