Robert CLEMENTS, Jr., Petitioner,

v.

Ira M. COINER, Warden, West Virginia State Penitentiary, Moundsville, West Virginia, Respondent.

Civ. A. No. 3745.

United States District Court
S. D. West Virginia,
Charleston Division.

May 13, 1969.

R. Page Henley, Jr., and George G. Guthrie, Spilman, Thomas, Battle & Klostermeyer, Charleston, W. Va., for petitioner.

Chauncey Browning, Jr., Atty. Gen. of West Virginia, and Morton I. Taber, Asst. Atty. Gen., Charleston, W. Va., for respondent.

## MEMORANDUM OPINION

FIELD, Chief Judge.

The petitioner in this proceeding seeks relief from a sentence of imprisonment imposed by a state court. Jurisdiction is invoked pursuant to 28 U.S.C. Section 2254. Petitioner sought post-conviction relief in the Supreme Court of Appeals of West Virginia, but that Court denied the petition in October 1967, without hearing or written opinion. Relief was thereafter sought in this court.

The sentence was imposed by the Intermediate Court of Kanawha County, West Virginia, on October 24, 1956, after the court had accepted petitioner's guilty plea to first degree murder with a recommendation of mercy. Petitioner is presently confined, pursuant to the sentence, in the West Virginia State Penitentiary at Moundsville, West Virginia. Petitioner contends that he was denied his constitutional rights for three reasons. They are alleged to be as follows:

1. The prosecution violated petitioner's constitutional rights by suppressing evidence material to petitioner's guilt and to the punishment subsequently imposed;

2. The plea of guilty entered by petitioner was not voluntarily made with an intelligent understanding of the consequences of the plea;

3. Petitioner should not be subjected to an additional five year sentence imposed upon the basis of a former conviction which was obtained when petitioner was without the assistance of counsel.

The petition was filed in this court on November 17, 1967. On that same day an order was entered, and served on both the then respondent Warden and the Attorney General of West Virginia, which order appointed counsel for petitioner and required that cause be shown why a writ should not issue. An answer, denying the allegations contained in the petition, was filed by the Attorney General, on behalf of the respondent, on December 8, 1967.

Subsequent thereto, on October 9, 1968, an order was filed setting the matter down for an evidentiary hearing on the allegations of the petition. That hearing was held on October 29, 1968, at which time evidence was presented relative to the three issues set forth above. Counsel for both the petitioner and the respondent were accorded the opportunity, subsequent to the hearing, to examine the record in this matter and submit briefs to the court. Counsel for petitioner filed a brief with an exhaustive analysis of the facts and law relative to the issues of concern here. Counsel for respondent chose not to brief the matter, but submitted the case on the basis of a recent decision in this state by Judge Maxwell, Stover v. Coiner, 290 F.Supp. 852 (N.D. W.Va.1968), which dealt with the issue of the voluntariness of a guilty plea.

The facts bearing on the issues are found to be as follows. Petitioner was arrested in Charleston, West Virginia, on July 27, 1956, in connection with the murder of his wife earlier that day. He was indicted for murder in September 1956 by a Kanawha County, West Virginia, grand jury, and two Charleston, West Virginia, attorneys, Chester Lovett, Esquire, and Edward W. Hiserman, Esquire, were appointed to defend him. These attorneys, after investigating the case, were of the opinion that no valid defense existed to the charge, and recom-

mended that petitioner plead guilty to first degree murder with a recommendation of mercy. Petitioner entered such a plea to that charge on October 24, 1956. He was thereupon sentenced to life imprisonment under which sentence he is now confined.

Prior to 1956 petitioner had been convicted of felonies on two occasions. The significance of these convictions is that their existence affected petitioner's eligibility for parole when he was sentenced to life on the murder conviction. This significance is manifested in W.Va.Code, ch. 62, art. 12, Section 13 which provided that:

"No person sentenced for life may be paroled until he has served ten years, and no person sentenced for life who has been previously twice convicted of felony may be paroled until he has served fifteen years. * * "

When petitioner entered his 1956 guilty plea, he was apparently under the erroneous impression that he would be eligible for parole in ten years. His court appointed attorneys in the murder case do not deny that petitioner might well have been under such an impression. In addition, the record indicates that petitioner had insisted prior to trial that he wanted to plead not guilty and stand trial. To some degree, at least, his change of mind prior to trial was in apparent reliance upon his understanding that he would be eligible for parole in ten years.

As noted above, the issues raised by this petition are three-fold. It is my opinion, however, that the most important of those issues is the one relating to the alleged suppression of evidence material to the 1956 murder case.

The petitioner alleges that his right to due process under the Fourteenth Amendment was violated in the 1956 proceeding, in that the prosecution suppressed certain evidence, of a documentary, scientific and medical nature, which was material both to the issue of petitioner's guilt and to the degree of the crime with which he was charged. The petitioner further contends that the evidence presently before this court, in the form of testimony and exhibits, supports this allegation.

The specific evidence which petitioner alleges to have been suppressed by the prosecution in connection with the 1956 murder charge included (1) the report of a polygraph examination made by the Charleston Police Department on July 14, 1956, and (2) a letter, dated October 23, 1956, relative to petitioner's mental condition in July, 1956, from a Charleston, West Virginia practicing psychiatrist and directed to the Prosecuting Attorney of Kanawha County, West Virginia. Petitioner alleges that both the polygraph report and the letter had a vital bearing upon the question of petitioner's mental condition at the time of the commission of the 1956 murder for which he was convicted.

The events of the month prior to the homicide are of more than passing concern in this case and gave rise to the polygraph examination alleged to have been suppressed in the 1956 murder case. Petitioner had been arrested on July 2, 1956, by the Charleston, West Virginia, Police Department in connection with his involvement in an alleged assault. While in custody on this charge, petitioner "confessed" to the murder of a Mercer County, West Virginia Deputy Sheriff in a 1950 breaking and entering. In that case, an accomplice of petitioner's in the breaking and entering had been convicted of the murder and was serving a life sentence for it.

The evidence indicates that petitioner had been consuming alcoholic beverages excessively for a substantial period preceding the assault and that he was a sick and violent man while in custody following the July 2nd arrest. His own testimony as to why he attempted to confess to the Mercer County murder was as follows (on direct examination at the evidentiary hearing on this petition):

"Q. At the time you were arrested you told the police that you wanted to make a confession. Will you explain to the court what that was about?

A. Well, I had been drinking an awful lot and at the time I thought maybe I could help my brother out by admitting I was the one that killed this Deputy Sheriff of Mercer County, and the next thing you know I had done started going out of my mind. I went completely crazy while I was in jail, beserk in jail.

Q. Mr. Clements, why did you make this confession?

A. I made it thinking it would maybe help my brother and I was sort of out of my head too at the time.

Q. As a result of this you were given a lie detector test?

A. Yes, sir."

The evidence indicates that the petitioner was sent to the Charleston Memorial Hospital on July 4, 1956, to receive sedation for a nervous condition in order that he might be questioned by the Mercer County authorities. The testimony and evidence confirms that, during this period, petitioner exhibited definite signs of deviant behavior and of psychological instability. Petitioner later repudiated the confession and the authorities eventually determined that he could not have committed the murder to which he had confessed.

Incident to the abortive "confession", however, on July 14, 1956, he was subjected to a polygraph examination. The polygraph examination was conducted by Sgt. D. C. Stover of the Charleston Police Department, and the report of that examination contained the following observations:

"* * * It was apparent that this subject was under terrific emotional strain and he had been confined in the Highland Hospital for the past two weeks for acute alcoholism and to be studied by psychiatrists with respect to a neurosis.

Clements was given three (3) tests which included several control questions. There were significant emotional disturbances on the relevant as well as the irrelevant questions and, therefore, this examiner is unable to state definitely by this subject's polygraph records whether or not he participated in this crime. It has been proven, however, by the facts concerning this case that it was impossible for this subject to have committed this crime.

It is suggested, because of these ambiguous disturbances, that this subject receive further psychiatric consultation in order to determine his true mental status."

On the day of this examination, petitioner was released from the custody of the Charleston Police. His testimony is to the effect that he spent most of his time from that date until the killing of his wife "drinking" at various places around Charleston. During that interval he had a hearing on July 19, on the earlier assault charge, and was released on bond. Thereafter, sometime around July 21, he was arrested for drunkenness and spent two or three days in jail. He was again released on bond on July 23 and his activities from that time until July 27 consisted of further "drinking". Specifically, his testimony as to his activities leading up to the death of his wife was as follows:

"Q. During the period of the evening of July 26 and July 27th do you have any recollection of what you did?

A. Yes, sir. I had been drinking with a couple of girls and I got a pistol from one of them, a .32, that I got a box, half a box of shells, and continued to drink with one of the girls, spent the night.

The next morning I went home to South Charleston, took a bath, shaved and changed clothes, come back to Charleston about 9 o'clock I think in the morning, traded the pistol in on a .38, got half a box of shells for the .38, and I continued to drink.

I got a pint of whisky, later went to a bootlegging joint and got a couple of gin highballs and went to the Wonder Bar, drank a couple of beers, and to Rudy's place at the lower end of Capitol Street, and I continued to

drink beer in there and whisky and made two or three trips to the whisky store for whisky, continued to drink.

Then I knew a waitress in Rudy's place, later on in the evening asked me if I was married and I said yes, I was going—I pulled out the pistol and told her I was going to kill my wife, I was looking for her now, and I got a cab and went to South Charleston by the hour and stopped at Roy's place, took another drink.

I was in the cab, went to South Charleston. I passed by the restaurant where my wife was working and on down the road a piece I had the driver turn back around and I went back to the restaurant and the crime was committed."

As previously noted, petitioner was subsequently arrested and charged with the first degree murder of his wife, to which charge he pleaded guilty on October 24, 1956. The day before the entry of that plea, a letter was written to the Kanawha County Prosecuting Attorney by a Charleston psychiatrist relative to petitioner's mental condition. That letter was not made available to the petitioner or his attorneys and the entry of the guilty plea was made without knowledge of its existence. The letter raised serious questions relative to petitioner's mental condition. Its content was as follows:

"THOMAS S. KNAPP, M. D.
205 Bradford Street
Charleston, West Virginia

— — —

Telephone 2-3289
October 23, 1956

J. Blackburn Watts
Prosecuting Attorney
Kanawha County Court House
Charleston, West Virginia

Re: Robert Clements, Jr.

Dear Sir:

Robert Clements, Jr. was admitted to Highland Hospital on July 6, 1956 (dis. July 14, 1956) from the city jail at the request of Dr. L. A. Dickerson. At that time he had confessed to a crime which had created considerable notoriety. At the time the patient was examined it also appeared that he was suffering from a toxic psychosis of the alcoholic variety. He also hallucinated vividly, heard a multitude of voices talking to him, could not sleep, had not been able to eat for a number of weeks, and was in a very poor physical condition. He was treated symtomatically and was remanded to the authorities as being clear of his psychosis.

I have not seen him since that time and therefore am unable to render an opinion as to his mental state at the time of the present alleged offense. However, it has definitely been established that during his first hospitalization he was mentally irresponsible and could not be held accountable for his actions. One only conjectures as to his mental state at the time of the present crime but certainly if he had indulged excessively in alcohol soon after his discharge from the hospital and taking also into consideration the fact theorganic (sic) deteriation (sic) has set in it is entirely fesable (sic) that a reactivation of his psychosis occurred. Again, this is a matter only of conjecture since I did not examine him following the committment (sic) of the present alleged offense.

Sincerely yours,

/s/ Thomas S. Knapp, M. D."

■ As stated, both the polygraph report and Dr. Knapp's letter were either in the possession of, or available to, the Prosecuting Attorney of Kanawha County when the petitioner entered his guilty plea on October 24, 1956 to first degree murder. Additionally, the record clearly shows that they were not made available to petitioner or his counsel. The question is whether the failure to make them available constituted suppression of material evidence in the context of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and related cases, thereby denying petitioner his constitu-

tional right to due process of law. That the suppression by the prosecution of material evidence favorable to an accused rises to the level of constitutional due process is well settled in light of Brady v. Maryland, supra. In that case the Court stated (373 U.S. at 87, 83 S.Ct. at 1196):

> "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

As stated above, the record clearly shows that the polygraph examination report and the psychiatrist's letter were not made available to the defense by the prosecution. This is supported by the testimony of petitioner's appointed co-counsel in the state murder case, Mr. Lovett and Mr. Hiserman. Mr. Lovett stated, after advising that he had been aware that a lie detector examination had been made on the petitioner:

> "Yes, I remember because Stover and I had done a little work together on some of these lie detectors and I either saw him personally or called him by telephone, I don't recall which, and told him that I had been appointed to represent this man and that I would like to know about a lie detector test that he took sometime before, and I was told then, as we usually were in those days, that he was very sorry, that the test was either the property —I don't remember if he said the property of the Charleston Police Department or the Prosecutor, and I was not permitted to see the test, nor was I told what the test was about or the results of the test. That's the main item that recalled this case to my mind because I very specifically remember about that lie detector."

When asked if he had any indication that Clements had been examined by a psychiatrist or doctor, Lovett responded thusly:

> "Yes, I knew that he had been, as he told me, to a Quarrier Street Hospital and talked to Dr. Knapp. Mr. Clements told me in my interview that Dr. Knapp gave him a bath and a shot of pentothal, and in this statement he gave me there was some mention so I did know that he had been under some psychiatric care prior to this incident."

He further stated, however, that he did not know that Dr. Knapp had written a letter to the Prosecuting Attorney.

Mr. Hiserman, co-counsel with Mr. Lovett in petitioner's defense, also testified and confirmed that the prosecutor did not disclose the report and letter. He stated at the hearing as follows:

> "May I read the polygraph examination? I don't believe I have ever seen it before. Maybe I did but I don't recall. (looking at paper) No, I don't recall that polygraph examination report. I don't believe, I don't think I have ever seen it. The only time I ever saw your exhibit, marked Exhibit 9, which is Dr. Knapp's letter, was when Mr. Guthrie showed it to me the other day.
> Q. That was in 1968?
> A. Yes, sir."

This testimony, of course, provokes the question of whether a request for such evidence by counsel in his state case is a prerequisite to petitioner's present standing to claim the advantage of the Brady principle. The problem is raised inferentially by the language of the Court in Brady referring to the suppression of evidence which should have been supplied "upon request." It should be noted that Mr. Justice Douglas, in the majority opinion in Brady, expressed the view that two decisions in the Third Circuit, United States ex rel. Almeida v. Baldi, 195 F.2d 815, 33 A.L.R.2d 1407, and United States ex rel. Thompson v. Dye, 221 F.2d 763, stated the correct constitutional rule in this area. Counsel for petitioner point out that in the Dye case, counsel had not requested that the prosecution divulge the evidence subsequently

**758**

shown to have been suppressed, and since that case was cited as stating the "correct constitutional rule," the Court should not permit the question of constitutional infringement to turn upon the presence or absence of such a request by counsel.

The Fourth Circuit has stated that the absence of a request by counsel should not preclude consideration of alleged constitutional errors. Barbee v. Warden, Md. Penitentiary, 331 F.2d 842 (4th Cir. 1964). As Judge Sobeloff stated (at 845–846):

> "* * * It is no answer that Barbee's attorney failed to ask for the results of the test. While a diligent defense counsel may have learned about the police reports, this is too speculative a consideration to outweigh any unfairness that actually resulted at the trial. He may not have known that tests were made. Indeed he may have been misled into thinking that the test, if made, supported the state's theory and were adverse to his client * * *.

> * * * In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel."

That the constitutional infringement should not turn on the presence or absence of a request was also stated by Mr. Justice Fortas in his concurrence in Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). In discussing that matter and referring to the Brady case, supra, he said (386 U.S. at 102, 87 S.Ct. at 811):

> "* * * Although this Court included in its statement of the controlling principle a reference to counsel's request * * * I see no reason to make the result turn on the adventitious circumstance of a request. If the defense does not know of the existence of the evidence, it may not be able to request its production. A murder trial—indeed any criminal proceeding—is not a sporting event."

■ It is my conclusion that in light of the above authority, consideration of a possible constitutional infirmity is not precluded because of the failure of defense counsel to make a timely request for · the production of relevant documents. This court relied upon Judge Sobeloff's opinion in the Barbee case, supra, in determining that constitutional due process had been violated by the prosecutor's suppression of material evidence in the case of Hamric v. Bailey, 274 F.Supp. 240 (S.D.W.Va.1967), aff'd 386 F.2d 390 (4th Cir. 1967).

In any event, the matter of concern here took place prior to Brady v. Maryland, supra, and as Mr. Lovett, one of petitioner's attorneys in the 1956 murder case, stated in his testimony at the hearing: "I don't ever remember seeing a criminal file before Brady versus Maryland." In response to a question as to whether it was the practice for the prosecutor to make such material as Dr. Knapp's letter available to defense lawyers, Mr. Lovett responded that "It definitely was not the practice. The practice was the opposite." This testimony indicates to me that in 1956 any request by counsel for the material allegedly suppressed would have been a futile gesture.

The Brady decision also requires that the evidence withheld from the defense be "* * * material either to guilt or to punishment * * *." The Fourth Circuit considered this matter in the case of Barbee v. Warden, supra, and this court considered it in Hamric v. Bailey, supra. In Barbee, the court stated (331 F.2d at 847):

> "* * * How strong a showing is required in a given case will depend upon the nature of the charge, the testimony of the state, and the role the undisclosed testimony would likely have played."

■ It is clear, however, that it is not to be left to the prosecution to decide what evidence is material and relevant to each particular case. The standard enunciated in Griffin v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990 (1950)

was approved by this court in Hamric v. Bailey, supra. The court in *Griffin* stated the principle as follows (183 F.2d at 993):

> " * * * (T)he case emphasize[d] the necessity of disclosure by the prosecution of evidence that may reasonably be considered admissible and useful to the defense. When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful. * * * "

 It is apparent from an examination of the report and letter of concern here that they should indeed be considered "material," as that term is used in the *Brady* case. The possibility of mental defects and the resultant limitation of criminal responsibility raised thereby amply support a determination of materiality. In addition, both of petitioner's court-appointed attorneys in the murder case testified emphatically at the evidentiary hearing that knowledge of the suppressed evidence would have substantially aided them in handling petitioner's defense. A further examination into petitioner's condition might well have altered the entire course of events, for the prosecution obviously accepted petitioner's guilty plea knowing that there was a serious question as to petitioner's mental capacity at the time of the alleged crime. Under the *Brady* rule, petitioner's conviction upon his guilty plea under these circumstances fails to satisfy the requirements of federal constitutional due process.

In the light of the above observations, it is my conclusion that the writ of habeas corpus should issue and Clements be released, subject to the right of the state to try him on the charge within a reasonable time, should it so elect. In view of my disposition of the suppression issue, it is unnecessary to pass upon the other issues raised in the petition.

I want to commend R. Page Henley, Jr., Esquire and George G. Guthrie, Esquire for their able and conscientious representation of the petitioner in this proceeding.

Counsel may tender for entry an appropriate order incorporating this opinion by reference therein.